IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| T-MOBILE SOUTH, LLC | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | NO. 1:10-CV-1464-AT |
| | ) | |
| CITY OF ROSWELL, GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CITY OF ROSWELL'S BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW the City of Roswell, Georgia ("Roswell"), Defendant in the above-styled civil action, and files this Brief in Support of Its Motion for Summary Judgment, showing the Court that it is entitled to same as follows:

## STATEMENT OF FACTS

In 2003, Roswell adopted an Ordinance entitled "Standards for Wireless Communications Facilities," Article 21.2 (R.102-115)[1], to establish guidelines for the siting of all wireless communications towers and antenna to "encourage the development of wireless communications while protecting the health, safety, and welfare of the public and maintaining the aesthetic integrity of the community." Section 21.2.1. R.102.  Section

---

[1]References are to the Original Certified Record of T-Mobile's Application filed with this Court on April 26, 2011. A Courtesy Copy has been provided to the Court in a notebook so labeled.

21.2.4(a)  provides the factors to be considered by the City and Council in determining whether to issue a permit for a wireless facility, which include: "proximity to residential structures and residential district boundaries," "availability of suitable existing towers, other structures, or alternative technologies (micro cells) not requiring the use of towers or structures," and "demonstrated need for the telecommunications facility at the specified site." R.104.

T-Mobile wishes to build a new cell tower on a vacant 2.8 acre parcel of land located at 1060 Lake Charles Drive in the very heart of one of Roswell's older and more distinguished residential subdivisions. R.58.  The proposed site is surrounded on all sides by residential homes, including lake side properties.  R.59,68,74.  T-Mobile desires to construct a 108 foot mono-pine cellular tower with an antenna centerline of 100 feet. R.58,150. The tower would be more than 25 feet taller than any existing tree now on the proposed residential site. R.58.

In accordance with Roswell's Ordinance, T-Mobile filed an Application for the new facility on February 2, 2010. R.121.  T-Mobile maintained that it was "responding to the demands of its customers." Id. In the report of its Radio Frequency Engineer, T-Mobile stated that the objective of the project is to provide "in building coverage in residential areas surrounding Jones Road, Shallowford Road and Woodstock Road." R.151. "Apart from **improving service** to T-Mobile's existing customer base," the application is made with the

expectation of customer growth in the area.  R.153. Likewise, the computer generated propagation maps prepared by this engineer clearly show that T-Mobile has coverage in the area, it simply does not have the level of coverage that it deems necessary to provide acceptable in home coverage and to support its anticipated growth. R.155, 156.

The Application was reviewed by the Zoning Department and it recommended approval of the application with the condition that the cell tower site be moved 120 feet east of the west property line, placing the onus of any visual impact on the leasing property owner receiving the financial gain. R.61. While the proposed T-Mobile site was in a clearing on the proposed property, the Zoning Department required moving the tower to a wooded area completely surrounded by trees. R.75. T-Mobile never accepted this condition, in effect making the recommended approval null and void. T.8 [2].

On April 12, 2010, the Mayor and Council held a hearing to consider T-Mobile's Application. R. 549. The coverage maps, as well as the report of the engineer were provided to Mayor and Council. In addition, T-Mobile provided balloon tests to attempt to show that the tower would not be visible to the surrounding homes. R.178-210A. Finally, T-Mobile provided several reports from an appraisal firm, that they provide in all applications in the Atlanta area, to attempt to show that property values would not be impacted from the

---

[2]References are to the Transcript of the hearing attached as Exhibit 9 to Plaintiff's Complaint. A request is made for the Original Transcript to be filed with the Court.

construction of the tower in the neighborhood. R.223-320. The reports show that the subdivisions studied were built **after** construction of the cellular tower (R.232, 236, 240, 244, 248, 253, 275, 281, 286, 304, 308, 313), and were thus not in well-established lake front neighborhoods with large lots comparable to the Roswell neighborhood at issue. (R.233, 237, 241, 254, 276, 282, 287, 310, 314).

The citizenry of the community came out in full force to show their opposition to the Application and the building of the tower in the Lake Charles neighborhood. Hundreds attended the hearing to oppose the tower. T.55. Brad Townsend, the Planning and Zoning Director, told the Council that the staff had received "over a thousand-plus emails, signatures, petitions, and letters in opposition of the proposed location." T.6. Representative samples are included throughout the Record.

Mr. Knighton, who lives in the Lake Charles Plantation Subdivision, expressed concern over visual impact and blight, questioned the results of the balloon tests and showed that it did not effectively represent the height and visibility of the tower. T.27-29.[3] He suggested "that the cell company was presenting wishes as needs" as evidenced by their

---

[3]T-Mobile's own representative admitted to Council that such photo simulations are not perfect and that it could have been windy during the shoot. T.83. In addition, residents' own photographs were submitted to Council to show the flaws of the test and the clear visibility of the balloon from adjacent properties. R. 354-361.

repeated refusal to give a direct answer to any question. T.27.[4]

Christy Levine, an attorney who lives in a property immediately adjacent to the proposed cell tower site, reiterated to the Council that the neighborhoods, the residential areas, are the heart and soul of the City and that under the law, the Board had the right to take into account the aesthetic impact of a tower on these areas. T.31-32. She also correctly pointed out that the City's Ordinance provides that the Board must consider proximity to residential structures and residential district boundaries in considering the Application. T.34-35.

Trudy Knighton, who has thirty years of experience in the telecommunications business, testified that T-Mobile was acquired by Deutsche Telekom in 2001 (T.44) and that there is a great deal of speculation in the industry and repeated articles concerning a possible spin off of T-Mobile because of their lagging sales and their lagging customer acquisitions. T.45. "Might they not just be building more cell towers to shore up their business for sale? Sounds like it could be likely to me." Id. Ms. Knighton testified that T-Mobile is only the fourth largest carrier in the country and has somewhere between 3/10 of a percent to 10 % of market share.[5] Id.

---

[4]He submitted evidence of the **unsubstantiated** application assertions to Council. R.417-418.

[5]T-Mobile refused to give any information on market share or customer numbers in Roswell claiming that such information was proprietary. T.45-46.

Knight said that she did a poll of 104 people in her Lake Charles neighborhood and only three had T Mobile. She extrapolated that to the population of Roswell and found that assuming every single person, including children and infants, had a cell phone- only 700 people in Roswell would have T-Mobile service. T.46. "We're talking about putting an 11 story cell phone tower in a neighborhood to serve only a very small handful of people." Id.

Tish McQuillen, a T-Mobile customer who lives approximately 250 yards from the proposed tower, and has been a T Mobile customer for five years, told the Council: "I have always had excellent reception on my cell phone." T.51. McQuillen conducted a drive study within a five mile radius of her home for over two hours and covered 46 miles. T.52. She did not drop one phone call and the coverage was clear the entire time. Id. She also tested coverage inside her home and had no problems. Id.[6] McQuillen told the Council that she had spoken with her brother in law, who has a Ph.D. in physics and teaches telecommunications at George Washington University in D.C. He told her that micro cells are the future  technology currently in use by most all of T Mobile's competitors. T.53-54. He said there were many alternative and less expensive solutions available to telecom companies to provide coverage and to fill gaps. Id. In addition, the citizens submitted evidence of alternative technologies available in the market and even the costs associated

---

[6]McQuillan also submitted a sworn Affidavit setting forth the specifics of her drive test and the results. R.344-345.

with the implementation of same. R.419-445.

> So the question is, why aren't they using these alternatives, and what is the action against our neighborhood really about? Is it about forging technology, wi-fi? Is it about T Mobile shoring up their inferior technology? Is it about a foreign entity building a franchise to sell out in a few years, or is it about money? What we do know is, it isn't about the company providing cell coverage for their customers in the Lake Charles area, as T Mobile's application claims.

T.54.

Finally, McQuillan spoke to the validity of the balloon tests which she witnessed and the fact that the photographed balloon was not at the height of the tower for more than a couple of minutes, certainly not enough time to take all the photographs presented to the Council.  T.56.

Sherry Ward, who lives right around the corner from the proposed tower, is a professional Mortgage Broker with the largest residential lender in the metro area, who spoke regarding the potential financial impact of the tower. T.56-57. Her testimony related to the Lake Charles neighborhood. T.58. Based on her years of experience, she opined that "a home that faces a cell tower is going to sell for less, if it sells at all. ... Buyers are picky. They're not going to buy a house next to a cell tower, not in this market, not when there are other houses to chose from." T.58-59. She also told the Council that she double-checked her own findings with Todd Roseberry, who's been in the business of real estate for 16 years. T.62. He's the owner of multiple Keller Williams Real Estate Offices and has managed an

office with over 100 agents for six years. Id. To quote Todd:

> cell towers kill, your neighborhood values, that is. The median price drop from a cell tower in a residential district will be between 5 to 35 percent per home on average. The homes closer to the tower will have a higher depreciation, and the homes a quarter to a half mile will be lesser. ... The bottom line from a real estate valuation perspective is the old adage, perception is reality. Buyers perceive a health threat with transmission towers, whether the threat is real or not. In addition, they're ugly. It's America. Like it or hate it, ugly doesn't sell.

Id. Evidence was then submitted by the residents showing the general flaws in T-Mobile's market analysis technique when proposing a new tower (R.363-375), as well as information relevant to the Lake Charles market. R.374-375.

Trent Orndorf, who lives in another area of Roswell, testified that the potential threat of a tower in his neighborhood caused everyone to sell and leave and caused the detrimental downgrading of his property value and neighborhood atmosphere. T.66-67. Finally, Major Chris Buck, who lives less than 300 feet from the proposed tower, testified that he didn't want to raise his two small children 300 feet from a cell phone tower and would not have purchased his home if he knew a tower was going to be built. T.69-70.

Also in the record is the fact that the T-Mobile website indicates that the area gets moderate to good service! R.328. The stated objective of the proposed tower site is to "respond to the demands of its customers" and "provide in building coverage in residential areas surrounding Jones Road, Shallowford Road and Woodstock Road." R.151. But T Mobile refused to answer any questions about how many customers it serviced in the area

and whether it had gotten any complaints regarding service in the area, asserting that all

such information was proprietary. R.329, 334. It provided no information regarding in-

building testing of service. Its response to the questioning was simply:

> The information requested ..is proprietary. T-Mobile has a responsibility as a
> business to provide the best service possible to our customers; any other
> business providing any kind of service or product has the same responsibility.
> If ONE customer demanded improved service, if ONE customer will receive
> the benefit of improved service, T-Mobile has a right to request this permit. ...
>
> One dropped call or one complaint is too much. We have determined that there
> is a need to improve service in this area to a level deemed acceptable by our
> engineers charged with monitoring the network. As a company, we are
> certainly entitled to determine the service levels we deem acceptable.

Id. Based on all the evidence presented, the Council unanimously denied the Application.

T.108. A letter setting forth the denial and a reference to the Minutes of the Meeting for the

reasons for same was sent to T-Mobile on April 14, 2010. R.559-560; 549-558.

## ARGUMENT AND CITATION OF AUTHORITY

**A.      Standard for Grant of Summary Judgment**

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed.R.Civ.P. 56(c). Allmond v. AKAL Security, Inc., 558 F.3d 1312,

1316 (11th Cir. 2009).   The party seeking summary judgment bears the burden of

demonstrating the absence of a genuine dispute as to any material fact. <u>Herzog v. Castle Rock</u>, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. <u>Graham v. State Farm</u>, 193 F.3d 1274, 1282 (11th Cir. 1999). In the instant case, the City is entitled to judgment as a matter of law.

**B.    The Telecommunications Act**

The Telecommunications Act ("TCA") was enacted to promote competition and advancement in the area of telecommunications. <u>Preferred Sites, LLC v. Troup County</u>, 296 F.3d 1210 (11th Cir. 2002). One of the reasons Congress enacted the TCA was to deal with inconsistent local zoning requirements which inhibited the building of cellular networks. <u>Id</u>. at 1214. But Congress also acknowledged "... there are legitimate state and local concerns involved in regulating the siting of such facilities ..., such as aesthetic values and the costs associated with the use and maintenance of public right of ways." <u>Id</u>. As a result, Congress enacted §704(a) to "... preserve the authority of state and local governments over zoning and land use matters except in ... limited circumstances... ." <u>Id</u>. Congress sought to balance these concerns by expressly preserving in the TCA the traditional authority enjoyed by state and local governments to regulate land use and zoning, while imposing certain "substantive and procedural limitations upon the authority of state or local governments to regulate the construction of facilities for wireless communication services." <u>Id</u>. at 1214-

1215. "The TCA thus strikes a balance between two competing aims-to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." Id.

As the Eleventh Circuit has noted, "[l]and use decisions are basically the business of state and local governments." American Tower LP v. City of Huntsville, 295 F.3d 1203, 1206 (11th Cir. 2002). There can be little doubt that land use regulation is "perhaps the quintessential state activity." FERC v. Mississippi, 456 U.S. 742, 768 n.30 (1982). The TCA "does not say otherwise." City Huntsville, 295 F.3d at 1207.

Indeed, the TCA specifically provides:

(7) Preservation of local zoning authority

(A) General authority
Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction and modification of personal wireless service facilities.
(B) Limitations
. . .
(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7).

In addition, Section 704 (a), describes the only substantive and procedural limitations on the authority of state and local governments to regulate the construction of facilities to

-11-

be used for wireless communication. Under these provisions, local governments may not:

(1)   Unreasonably discriminate among providers of functionally equivalent services; (§332(c)(7)(B)(i)(I))

(2)   Take actions that prohibit or have the effect of prohibiting the provision of personal wireless services; (§332(c)(7)(B)(i)(II)) or

(3)   Limit the placement of wireless facilities on the basis of the environmental effects of radio frequency emissions (§332(c)(7)(B)(iv)).

**C.    Substantial Evidence in the Written Record.**

First, T-Mobile alleges that there is not substantial evidence to support the City's denial of its Application. The substantial evidence standard contained in the TCA is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." City of Huntsville, 295 F.3d 1207. "It requires more than a mere scintilla but less than a preponderance." Id. Further, "the party seeking to overturn the local zoning board's decision has the burden of proving that the decision is not supported by substantial evidence." Id. The determination of whether the denial of an application for a cell tower is proper is based exclusively upon an examination of the evidence before the local government. 47 U.S.C. §332(c)(7)(iii).

As is demonstrated in the written decision and supporting record denying the application, there is  substantial evidence supporting the denial and the City rightly found

that T-Mobile failed to meet its burden to show that its application should be granted. The evidence clearly shows that there is already adequate coverage in the subject area, and thus T-Mobile failed to show why it needs the tower, particularly in this exclusively residential area. Further, as previously stated, T-Mobile did not present sufficient evidence to counter the voluminous testimony and evidence regarding the adverse effect its proposed tower would have on the surrounding residential area.

In conducting a substantial evidence review, the Court is required to consider the record in its entirety, including evidence unfavorable to the administrative decision. Preferred Sites, 296 F.3d at 1218. "A reviewing court cannot substitute its own judgment for that of the local board, and must uphold the zoning decision if it is supported by substantial evidence whether or not that court would reach the same conclusion in the first instance." Id. Thus, a decision will be considered supported by substantial evidence if the record contains such relevant evidence as a reasonable mind might accept as adequate to support the conclusion.

In Michael Linet, Inc. v. Village of Wellington, 408 F.3d 757 (11th Cir. 2005), the Court found that "although blanket aesthetic objections do not constitute substantial evidence," "aesthetic objections coupled with evidence of an adverse impact on property values or safety concerns can constitute substantial evidence." The Board had before it testimony of residents and a realtor about the effect of the tower on property values and

negative testimony about the site's aesthetic impact upon an established residential neighborhood. See also American Tower LP v. City of Huntsville, 295 F.3d 1203 (11th Cir. 2002)(court found substantial evidence existed in record to deny special exemption and variance because Huntsville's general zoning ordinance allowed Board to consider aesthetic effect and real estate agent testified that tower would lower property values and others testified that tower's proximity to two schools and several soccer fields rendered it unsafe).

In addition to the residents' opinions regarding the loss in value if the tower were built, a realtor also testified that such a loss in value would occur. Id. at 762. Furthermore, Georgia law allows a homeowner to testify regarding the market value of his home. Schoolcraft v. DeKalb County, 126 Ga. App. 101, 189 S.E.2d 915 (1972). The Eleventh Circuit has recognized that it should accept these types of statements as competent evidence with respect to a tower's impact upon property values, and it has noted that issues of value are especially ones of fact left to the discretion of the fact finder. City of Huntsville, 1203 F.3d at 1209 n.7. Thus, the testimony of Roswell citizens regarding their loss in value is something the Council could and should consider in its decision.

T-Mobile's attempt to address this issue consisted solely of its argument that in some cases house prices appreciated, even in the presence of a nearby cell tower and offered several studies of other neighborhoods where the towers were built prior to construction of the homes studied. This evidence in no way addressed the effect of cell towers upon the

value of homes in the Lake Charles subdivision. In addition, it did not address whether the houses would have appreciated more without the presence of the tower, and whether the area studied by T-Mobile was similar (in terms of topography, proximity to more urban areas, etc.) to where this tower was to be constructed. See T-Mobile South, LLC v. Cobb County, 2011 W.L. 336641 (N.D.Ga. 2011)(same evidence submitted and found to be insufficient to overturn the Board's decision).

In the case at bar, there was considerable testimony from the neighbors of the proposed tower as to its incompatibility with the surrounding land use. There was evidence that at least some of the houses are directly adjacent to the proposed tower site. Citizens purchased their homes in reliance upon the fact that the area is residentially zoned, rightfully expecting that commercial uses, such as a tower the height of an eleven story building, would not be allowed next to their homes. In short, this is exactly the type of scenario which demonstrates the need for local governments to exercise their land use regulatory authority which has long been recognized by the federal courts. Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365 (1926).

As in the most recent decision by Judge William S. Duffey in Cobb County, "the aesthetic objections asserted were substantially related to and supported by the residents' concerns about and the evidence showing an adverse impact on property values and other local impacts." As that court recognized, evidence to the contrary, including reports

pertaining to property values in other areas and balloon tests exactly as the ones at bar, "did not discredit that there existed substantial evidence to support the Board's decision to deny the Application." <u>Id</u>.

Most importantly, exactly as the Court found in <u>Cobb County</u>, T-Mobile has failed to demonstrate a sufficient need for the proposed tower. Just as in that case, T-Mobile points to its computer generated coverage map, and argues that there is an "area of poor coverage in the area surrounding the proposed tower." But, as there, the evidence shows that T-Mobile has adequate cellular coverage in the subject area. It represented to its customers that it had fair to good service in its advertising materials. Again, there, like here, despite the representations, T-Mobile now asserts that service in the area is "poor" and insufficient for customers to use their phones in residential buildings. Yet, just as in <u>Cobb County</u>, T-Mobile's engineer did not evaluate in home signal strength - the strength T-Mobile argued was the problem sought to be addressed by the new tower.

> The testimony of local residents about their existing T-Mobile service was equally credible evidence -and perhaps the better competitive measure- that Plaintiff's customers in the area at issue in this case are satisfied with their service. Plaintiff did not offer any evidence that any T-Mobile customer was or is dissatisfied with their wireless service. Indeed, the weight of the evidence is that they are satisfied. ...Finally, T-Mobile did not present any evidence that it had received complaints of dropped calls from its customers in the area near the proposed tower.

> T-Mobile refused to give any information regarding its customer base in the area or

any complaints that it received. If there are only 700 T-Mobile customers in Roswell as determined by the residents, T-Mobile's stated statistic that in 2009, only 16.5% were wireless, makes the numbers in the City alone relying on in home service just over a hundred and in the subdivision in question infinitesimal. Such insignificant numbers certainly would not justify a **need** for a tower.

Like Judge Duffey, this Court should not second guess the Council's determination of credibility or the Council's finding that T-Mobile failed to meet its burden of showing the need for the tower.

**D.     The City's Actions Did Not Prohibit or Have the Effect of Prohibiting the Provision of Wireless Service.**

In Section 7(B)(i)(II), it appears that Congress sought only to prevent regulatory schemes, such as blanket prohibitions of towers in a particular zoning district or policy statements, such as a governmental expression of policy, against these types of devices. See AT&T Wireless PCS v. City Council of the City of Virginia Beach, 155 F.3d 423 (4th Cir. 1990). (This decision was relied upon by the Eleventh Circuit in several decisions regarding "substantial evidence.")

There are no blanket prohibitions of towers in a particular zoning district or policy statements that preclude a tower in a residential district in Roswell. In fact. there are numerous towers within the City located in residential districts, including a recently

approved tower for T-Mobile at Crabapple Middle School, just over one mile from the subject site. R.65,330. T-Mobile already has seventeen sites in the City. R.160-165.

The Eleventh Circuit has not considered what is required to establish a violation of the TCA's anti-prohibition clause. Other courts have considered the question, and have been examined and reviewed by local district courts, including the Northern District of Georgia in Powertel/Atlanta, Inc. v. City of Clarkston, 2007 WL 2258720 (Aug. 3, 2007)(Judge Story).

> Certainly a blanket prohibition on the construction of wireless communication facilities would violate this provision. E.g., Metro PCS, Inc. v. City and County of San Francisco, 400 F.3d 715, 730 (9th Cir. 2005); 360 Degrees Communications Co. of Charlottesville v. Board of Albemarle County, 211 F.3d 79, 86 (4th Cir. 2000). ... Other circuits which have considered the TCA's anti-prohibition clause have held that, even in the absence of a general ban on wireless services, state or local governments may effectively prohibit the provision of wireless services in violation of the TCA by preventing a wireless provider from closing a "significant gap" in service coverage. See, e.g., Metro PCS, 400 F.3d at 732-34; Omnipoint Communications Enters., L.P. v. Zoning Hearing Board of Easttown Township, 331 F.3d 386, 399-400 (3rd Cir. 2003); Voicestream Minneapolis, Inc. v. St. Croix County, 342 F.3d 818, 835 n.7 (7th Cir. 2003); Second Generation Props. L.P. v. Town of Pelham, 313 F.3d 620, 631-32 (1st Cir. 2002); Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999). While these courts have differed significantly on what constitutes a "significant gap" in service coverage, they agree on at least three basic concepts integral to the "significant gap" analysis. First, all courts agree that not every gap in service is "significant" within the meaning of the TCA. Thus, decisions by state and local governments which result in de minimis denials of service do not constitute effective prohibitions on the provision of wireless services for the purposes of the TCA. See e.g., MetroPCS, 400 F.3d at 734 (explaining that "the TCA does not guarantee wireless service providers coverage free from small "dead spots" and that the relevant service gap must

be truly significant and 'not merely individual dead spots within a greater service area.); <u>360 Degrees</u>, 211 F.3d at 87 (stating that the TCA "obviously cannot require that wireless services provide 100% coverage," and explaining that the federal regulations expressly anticipate the existence of dead spots within a service area); <u>Sprint Spectrum, L.P. v. Willoth</u>, 176 F.3d 630, 643-44 (2nd Cir. 1999)("Where the holes in coverage are limited in number or size (such as interiors of buildings in a sparsely populated area, or confined to a limited number of households or spots as the area covered by buildings increases) the lack of coverage likely will be de minimis" and denying applications will not be a prohibition of services).

While Plaintiff may try to label the tower in some other way, as it did in its complaint, it is undisputed that the proposed cell tower is a "capacity" tower and not a "coverage" tower.  That is, it is designed to increase the level of service, as opposed to providing service.  It is undisputed that T-Mobile's existing system provides coverage in the area the proposed tower would serve and that an additional tower at this location is not warranted for "seamless" RF (radio frequency) coverage. The propagation maps presented show coverage of between -96 dBm to at least -84 dBm and in some places just under -76dBm. Its engineer stated that it was "improving service" in the area. Plaintiff is not entitled, based upon its own unfettered discretion and economic motivation, to place an additional capacity tower at any location it wishes.

In an important Second Circuit case, <u>Sprint Spectrum LP v. Willoth</u>, 176 F.3d 630, (2nd Cir. 1999), the Court considered the issue of whether a local municipality must grant tower applications for additional towers.  In <u>Willoth</u>, the Town of Ontario, New York,

denied Sprint's applications to construct three cell towers.  The district court upheld the

denial and the Second Circuit Court of Appeals affirmed.  In addressing the additional tower

issue, the Court stated:

> A local government may also reject an application that seeks permission to construct more towers than the minimum required to provide wireless telephone service in a given area.  A denial of such request is not a prohibition of personal wireless services as long as fewer towers would provide users in a given area with some ability to reach cell sites. ... Furthermore, once an area is sufficiently served by a wireless service provider, the right to deny applications becomes broader: state and local governments may deny subsequent applications without thereby violating Section(B)(i)(II). ... Where the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area) or confined in a limited number of houses or spots as the area covered by building increased) the lack of coverage likely will be de minimis so that denying applications to construct towers necessary to fill these holes will not amount to a prohibition of service.

Id at 643-44. (Emphasis added).

The Court's well-reasoned opinion in Willoth is directly applicable to the case at bar.

Willoth clearly articulates the principle that the City, in this case, is not required to grant an

Application every time T-Mobile seeks permission to construct more towers than the

minimum required to provide wireless telephone service in a given area.  This is especially

true where fewer towers would provide users in a given area with some ability to reach cell

sites.  Id.  In this case, not only do T-Mobile customers have "some ability to reach cell

sites," T-Mobile has full coverage in this area. Its own engineer stated that it was

"improving service." When considering the balancing of local authority with the federal

goals and objectives, the holding in <u>Willoth</u> is the right result for the right reason.

In essence T-Mobile's argument is that it has the right under the TCA to construct "any and all towers" that, in its business judgment, it deems necessary to compete effectively with other telecommunication providers.  Again, as noted in <u>Willoth</u>:

> This untenable position flounders on the statutory language.  Since Sprint admits that it would never propose to build towers it deems unnecessary to compete successfully, a fact which undoubtedly holds true for most service providers, such a rule would effectively nullify a local government's right to deny construction of wireless communications facilities, a right explicitly contemplated by the TCA.  <u>Sprint Spectrum LP</u>, 176 F.3d at 639 (quoting <u>AT&T Wireless PSC</u>, 155 F.3d at 428).

The Middle District of Florida has specifically considered the "capacity issue" in a case similar to the case at bar, and found that denying a request for a "capacity" tower does not violate the  TCA. In <u>AT&T Wireless Services of Fla. v. Orange County</u>, 23 F. Supp.2d 1355 (M.D.Fla. 1998), the district court found substantial evidence in the record to support the denial of AT&T's application to place a 99-foot tall church steeple containing a wireless communication antenna.  AT&T argued that "its desire to have a tower of useful height within its designated search ring is a hardship sufficient to justify a variance". <u>Id</u>. at 1361.

In rejecting AT&T's argument, the Court stated:

> Implicit in AT&T's argument is the notion that cellular facilities are entitled to variance consideration on a non-traditional standard, based on a demonstrated need for added capacity in a given area.  However, so long as local authority does not act to ban cellular service, the Telecommunications Act does not change the substantive land use controls enforceable by the local

governments.  The hardship described by AT&T in meeting its service levels, (no matter how well documented) is simply not the kind of hardship traditionally recognized as grounds for a variance.  Impairment of a particular proposed activity is not a unique hardship to the property. ... AT&T seeks to avoid its effect simply because additional cellular capacity is desirable in the area. ...To upset that balance, AT&T must show more than a demand for additional service and a desire to build another tower.  If market forces for improved and expanded service were enough to avoid the set back requirements, the County would be obligated to approve every application, virtually without regard to the impact on surrounding areas.

Id. at 1361.

In the case at bar, T-Mobile seeks to avoid the Council's failure to permit the cell tower, simply because additional cellular capacity is desirable in the area to provide better in home coverage.  T-Mobile must show more than a desire to provide **better** in home coverage to override the sound and considered decision of the Roswell Mayor and Council. Of equal importance, the Mayor and Council are entitled to consider the fact that if they grant this capacity site for T-Mobile, they may be forced to accommodate any and all other capacity site applications by T-Mobile and all other providers, or risk running afoul of the TCA. One look at the gray areas on the propagation maps show that Roswell can anticipate application after application by T-Mobile to get the level it wants (green coverage) throughout Roswell.

The TCA does not require Roswell, at the cost of disregarding sound land use principles and zoning concerns, to provide "perfect" telecommunications service and ensure

that no one ever gets a busy signal, or momentarily waits for a call to be connected.  T-Mobile would have to concede that it  will be able to continue providing services with its existing towers, albeit somewhat inferior service compared with what the proposed tower could make possible. These  factors, including the ordinance's stated desire to protect the health, welfare and safety of its citizens and the aesthetic integrity of the community and the "capacity" verses "coverage" issues, were all properly considered by the Mayor and Council in reaching their decision to deny the Application.

**E.     This Court Should Evaluate All Alleged Violations of the TCA Solely on the Record the Mayor and Council Had to Make Its Own Decision.**

The Record constitutes all of the evidence and documents which were before the Mayor and Council at the time they made their decision to deny T-Mobile's request for a cell tower.  The Record also contains the official minutes of the meetings of the Mayor and Council when they considered Plaintiff's request.  When this Court considers the decisions made by the Mayor and Council, and the effect of those decisions, it is proper to consider only the "Record" before the Mayor and Council at the time of and upon which they based their decisions.

A review of the case law in the Eleventh Circuit supports the Defendants' position. In <u>Gearon & Co., Inc. v. Fulton County, Georgia</u>, 5 F. Supp.2d. 1351, (N.D. Ga, 1998), the Court limited its consideration of the "discrimination" issue and "prohibiting" issue to the

Record.  In the opinion, the Court indicated that it considered the record only.

Other District Court opinions in the Eleventh Circuit, where the Court has decided the issues presented in this case, reinforce the principle that the Court's consideration is limited to the record.  See, Sprint Spectrum, LP v. Jefferson County 968 F. Supp. 1457 (N.D. Ala. 1997); Bell South Mobility v. Gwinnett County, 944 F. Supp 923 (N.D. Ga. (Tidwell) (1996));  AT&T Wireless Services of Florida v. Orange County, 23 F. Supp.2d 1355 (M.D. Fla 1998)(this cause comes before the Court for final decision upon the record established in the proceedings before Orange County); Group EMF, Inc. v. Coweta County, (1999 W.L. 404677, N.D. Ga. (Camp))(the Court considers the Record in its entirety); AT&T Wireless PSC, Inc. v. City of Chamblee, 10 F. Supp 2d 1326,1329 (N.D.Ga. 1997)(the Court must search the whole record). There is no Eleventh Circuit authority which supports supplementing the Record with additional evidence that was not before the Mayor and Council.[7]

**F.   The City did not Discriminate Against T-Mobile in Denying the Application.**

Plaintiff alleges that the decision of the Council discriminates among providers of

---

[7]Defendant realizes that there are other jurisdictions in which outside evidence is permitted to address prohibition and discrimination claims. However, the Eleventh Circuit has yet to rule on this issue, and no Georgia court has relied on extraneous evidence to decide these issues. More importantly, as T-Mobile was required to and did make a constitutional challenge to the Council's consideration of the evidence, all such evidence regarding the issues raised therein should have been presented to the Council so that they could be considered.

functionally equivalent services in violation of Section 332(c)(7)(B)(i)(I). There is simply no evidence whatsoever that Roswell has discriminated "among providers" of cellular services.  Furthermore, in order to prevail under this theory, Plaintiff must show that Roswell not only discriminated, but unreasonably discriminated "among providers" of cellular services. Section (7)(B)(i)(I). Again, there is absolutely no such evidence inside or outside the record to support such an allegation.

## **CONCLUSION**

The record before the Roswell City Council shows much more than a mere scintilla of evidence supporting the denial of the application. In fact, although not required, the preponderance of the evidence supports the denial. Therefore, Roswell respectfully requests that the Court grant its motion for summary judgment as to all counts of Plaintiff's Complaint as it is entitled to same as a matter of law.

This 29th day of April, 2011.

CAROTHERS & MITCHELL, LLC


/s/ Regina B. Reid
REGINA B. REID
Georgia Bar No. 006630
Attorney for Defendant City of Roswell

1809 Buford Highway
Buford, Georgia 30518
(770) 932-3552

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have this date electronically filed the foregoing **DEFENDANT CITY OF ROSWELL'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Scott E. Taylor, Esq.
J. Tucker Barr, Esq.
Arnall, Golden, Gregory, LLP
171 17th Street, NW, Suite 2100
Atlanta, Georgia 30363

I further certify pursuant to L.R. 7.1D that the above-titled document complies with L.R. 5.1B and was prepared using a 14 point Times New Roman font.

This 29th day of April, 2011.

CAROTHERS & MITCHELL, LLC

/s/ Regina B. Reid
REGINA B. REID
Georgia Bar No. 006630
Attorney for Defendant
City of Roswell

1809 Buford Highway
Buford, Georgia 30518
(770) 932-3552