IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| T-MOBILE SOUTH, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:10-cv-1464-AT |
| CITY OF ROSWELL, GEORGIA, | : | |
| | : | |
| Defendant. | : | |

**OPINION AND ORDER**

## I.    Introduction

This long litigated telecommunications case has passed through a host of legal minefields over more than a dozen years and is now before the Court on the parties' Motions for Summary Judgment (Docs. 186, 209). This Opinion and Order addresses important new threshold legal questions posed as the Court endeavors to move this case forward to final resolution subsequent to the Federal Communications Commission's issuance of new telecommunications regulations that have shifted the standards for local governments' approval of proposed cell towers, and in turn, judicial review of resulting legal challenges.

Plaintiff in this case, T-Mobile South, LLC ("T-Mobile"), seeks to construct a cell tower in a residential neighborhood in the City of Roswell, Georgia ("the City") to improve its wireless service in the vicinity. T-Mobile argues that the City's refusal to approve its application to construct its proposed cell tower amounts to a

prohibition of the provision of wireless services under the Telecommunications Act of 1996 ("TCA"). *See* 47 U.S.C. § 332(c)(7)(B)(i)(II). The case has already gone through a trip to the Supreme Court and multiple rounds of summary judgment motions since its inception in 2010. In the previous round of summary judgment, which was back in 2016, the Court acknowledged that the Eleventh Circuit has never expressly clarified what the appropriate test should be for evaluating anti-prohibition claims under Section 332 of the TCA. However, the Court recognized that other Circuits that *have* addressed what the appropriate standard should be generally require wireless providers to establish, as a threshold matter, that the provider has a "significant gap" in coverage in the relevant vicinity. At the same time, courts that apply variations of the significant gap test have taken different approaches to determine what qualifies as a prohibition of services in areas where a significant gap in coverage exits. In its 2016 Summary Judgment Order ("the 2016 MSJ Order"), the Court followed an approach that would require the provider to show that its proposal is the least intrusive means of remedying the coverage gap while also accounting for the interests that the locality's denial of the provider's proposal sought to serve. In this case, that means minimizing the aesthetic impact of the cell tower and the potential reduction of property values in the surrounding neighborhood. At the conclusion of the 2016 MSJ Order, the Court remanded the matter to the City to evaluate T-Mobile's application under that standard. The following year, the City denied the application again and the parties filed another round of Motions for Summary Judgment (Docs. 186, 209).

In 2018, the Court held an evidentiary hearing in relation to these most recent Motions to assess whether T-Mobile had a significant gap in coverage at the time the City denied the application in 2017.  But before the parties had finished presenting evidence, T-Mobile notified the Court of a new Declaratory Ruling from the FCC, which had rejected the significant gap test and supposedly changed the applicable legal standard for resolving anti-prohibition claims.   T-Mobile requested on this basis that the Court terminate the hearing in progress and immediately rule in its favor after briefing.  The Court administratively closed the case and held the matter in abeyance after a series of parallel challenges across the nation to the Declaratory Ruling were consolidated and left the status of the law uncertain.  Although several components of the Declaratory Ruling were ultimately struck down in a consolidated action before the Ninth Circuit, *see City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020), significant portions of the rule remain in place.

Now that the legal waters have settled, the Court must consider the 2018 Declaratory Ruling's effect on the parties' pending Motions for Summary Judgment. The primary issue before the Court is whether the standard articulated by the Declaratory Ruling should be applied retroactively to the City's decision to deny T-Mobile's application in 2017; or, alternatively, whether the City's decision should be assessed under the version of the significant gap test articulated by this Court in the 2016 MSJ Order.  To answer this question, the Court must determine whether the Declaratory Ruling is an interpretive rule that can be applied

retroactively, or a substantive rule that potentially has retroactive effects.  This is no simple task — especially in a case like this one in which the rule in question has both interpretive and substantive components, and essentially creates a new legislative regime simply by resolving unsettled issues of statutory interpretation. Alternatively, the 2018 Declaratory Ruling could potentially reflect an unreasonable interpretation of the relevant statutory language such that it would not be entitled to deference by this Court even if it could otherwise be applied retroactively.  But that latter question is one that only the Eleventh Circuit can address in the first instance under current Eleventh Circuit precedent.  *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119–21 (11th Cir. 2014); *but see Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1106 (11th Cir. 2019) (Pryor J., concurring) (calling for a re-examination of *Mais*).

For the reasons that follow, the Court concludes that the Declaratory Ruling should be treated as a substantive rule and that it cannot be applied retroactively to the City's decision.  However, the Court recognizes that this is a very close legal call, and the Court finds it appropriate to certify an interlocutory appeal under 28 U.S.C. § 1292(b).

## II.    Background

### A.    T-Mobile's 2010 Application and Subsequent Lawsuit

On February 2, 2010, T-Mobile filed an application with the City requesting permission to construct a 108-foot tall "monopine" telecommunications tower on

a 2.8-acre parcel of land.  (2016 MSJ order, Doc. 162 at 6.)[1]  The land is located on a lakeside property in a single-family residential neighborhood.  (*Id.* at 6–7.)  T-Mobile selected the property as a proposed location for the cell tower after the City had rejected its initial proposal to construct the cell tower on the roof of a fire station also adjacent to a residential neighborhood.  (*Id.* at 7 & n.3.)  T-Mobile contends that it needs to construct the tower to "respond[ ] to the demand of its customers" and provide "seamless, ubiquitous, and reliable coverage" in the area. (*Id.* at 7.)

The proposed tower would resemble a large pine tree.  (*Id.* at 9.)  Though the property already contains trees that are between 83 and 86 feet high, the cell tower would still be visible from surrounding properties.  (*Id.* at 9–12.)  Opponents of the cell tower submitted a petition to the City with over 900 signatures stating that the proposed cell tower is "inconsistent with the character of the neighborhoods surrounding this location."  (*Id.* at 12.)  At the conclusion of a public hearing on April 12, 2010, the Roswell City Council voted unanimously to deny T-Mobile's application.  (*Id.* at 9, 15.)  Two days later, the City's Planning and Zoning Director sent T-Mobile a letter advising it that the application had been denied.  (*Id.* at 18.)

T-Mobile initiated this action shortly thereafter.  (*Id.* at 1; *see* Compl., Doc. 1.)  In the Complaint, T-Mobile alleged that the City improperly denied its

---

[1] Rather than recount the long and winding history of this case in full, the Court incorporates by reference the facts discussed in the 2016 MSJ Order.  That said, the Court acknowledges that there have still been significant developments in the case since that time.  With that in mind, the Court has endeavored to summarize both the history of these developments and the events leading up to the 2016 MSJ Order with relative brevity.

application for a cell tower and that the denial violated the TCA on three separate grounds:  (1) that the denial was not supported by substantial evidence within the meaning of 47 U.S.C. § 332(c)(7)(B)(iii); (2) that the denial constituted a prohibition of the provision of wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II); and (3) that the denial unreasonably discriminated among providers of functionally equivalent services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I). (Compl. ¶¶ 88–107.)  The parties subsequently resolved the last Count through a stipulation of dismissal.  (*See* Doc. 103.)  As its requested relief, T-Mobile sought an injunction that would compel the City to issue a permit to build and operate the cell tower on the selected property.  (Compl. at 33.)

Both parties moved for summary judgment the next year.  (Docs. 104, 106.) On March 27, 2012, the Court issued an Order denying the City's Motion and granting T-Mobile's Motion.  (Doc. 124.)  In that Order, the Court concluded that the City's denial of T-Mobile's application was procedurally faulty because the City "fail[ed] to issue a written denial separate from the written record" of the City's public hearing regarding the T-Mobile application (and announcement of the City Council's vote on the matter) that both "describe[ed] the reasons for the denial" and "contain[ed] a sufficient explanation of those reasons to permit this Court to evaluate the evidence in the record that supports those reasons."  (*Id.* at 19–20.) The Court did not address T-Mobile's anti-prohibition claim because it found  that T-Mobile was entitled to its requested relief based on this procedural failure alone. (*Id.* at 20.)

The City appealed the Court's 2012 Summary Judgment Order and the Eleventh Circuit reversed the decision in *T-Mobile South, LLC v. City of Roswell, Ga.*, 731 F.3d 1213 (11th Cir. 2013).  However, the Supreme Court subsequently reversed the Eleventh Circuit's decision in *T-Mobile South, LLC v. City of Roswell, Ga.*, 574 U.S. 293 (2015), clarifying the requirements for how a governmental entity may properly give timely notice of its decision in such cases.[2]  Following this series of appeals, the case was remanded to this Court to consider T-Mobile's claims anew.  (*See* Doc. 140.)

### B.    The 2016 Summary Judgment Order and Remand to the City

After the remand, the Court issued another summary judgment order on October 7, 2016.  (*See* 2016 MSJ Order.)  This time, the Court found that the City's denial of the application was supported by substantial evidence based on the aesthetic impact of the cell tower on the community in combination with its potential adverse effect on property values, consistent with Eleventh Circuit

---

[2] More specifically, the Supreme Court explained,

> [W]e hold that the Act requires localities to provide reasons when they deny cell phone tower siting applications, but that the Act does not require localities to provide those reasons in written denial letters or notices themselves. A locality may satisfy its statutory obligations if it states its reasons with sufficient clarity in some other written record issued essentially contemporaneously with the denial. In this case, the City provided its reasons in writing and did so in the acceptable form of detailed minutes of the City Council meeting. The City, however, did not provide its written reasons essentially contemporaneously with its written denial. Instead, the City issued those detailed minutes 26 days after the date of the written denial and just 4 days before petitioner's time to seek judicial review would have expired. The City therefore did not comply with its statutory obligations.

*T-Mobile South, LLC*, 574 U.S. at 307–08 (footnote omitted).

authority. (*Id.* at 29–33); *see, e.g.*, *Michael Linet, Inc. v. Vill. of Wellington, Fla.*, 408 F.3d 757, 761–62 (11th Cir. 2005) (recognizing that established Circuit authority provides that evidence of community "aesthetic objections coupled with evidence of adverse impact on property values or safety concerns can constitute substantial evidence" and further finding that it may also be relevant "whether the company can reasonably place a cell site in an alternative location and eliminate the residents' concerns"). As noted in *Linet*, the traditional substantial evidence standard for review of administrative decisions applied is one that "requires more than a mere scintilla but less than a preponderance," and the provider (Linet) "ha[d] the burden of proving the village decision was not supported by substantial evidence." *Id.* at 762 (citing *Am. Tower, LP v. City of Huntsville*, 295 F.3d 1203, 1207 (11th Cir. 2002)).

The Court then proceeded to analyze T-Mobile's anti-prohibition claim. Importantly, the TCA recognizes that, with certain exceptions, "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). However, the statute also contains the following limitation: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." *Id.* § 332(c)(7)(B)(i)(II). In evaluating this clause, the Court explained,

> Although the Eleventh Circuit has not addressed this issue, "[o]ther circuits which have considered the TCA's anti-prohibition clause have held that, *even in the absence of a general ban on wireless services*, state or local governments may effectively prohibit the provision of wireless services in violation of the TCA *by preventing a wireless provider from closing a 'significant gap' in service coverage.*"

(2016 MSJ Order at 34) (emphasis in original) (quoting *Powertel/Atlanta, Inc. v. City of Clarkston*, No. 1:05-cv-3068, 2007 WL 2258720, at *5 (N.D. Ga. Aug. 3, 2007)) (collecting cases).  But even among courts that apply the "significant gap" test, there is disagreement about what qualifies as a significant gap in coverage.  (*Id.* at 35–36) (noting that "[t]he test employed by the Second and Third Circuits – known as the 'one-provider rule' – holds that a significant gap exists only if 'the area the new facility will serve is not already served by another provider,'" whereas "[t]he First and Ninth Circuits . . . have rejected the 'one provider' approach and follow the 'multiple-provider rule,' which holds that a significant gap in coverage exists 'if the *provider in question* is prevented from filling a significant gap *in its own* service network") (emphasis in original) (citations omitted).  Similarly, the Court noted the Circuits' differences regarding "the precise showing required" with respect to "the intrusiveness or necessity of the provider's proposed means of closing the gap."  (*Id.* at 37) (noting that "[t]he Second, Third, and Ninth Circuits require the provider to show that 'the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve,'" whereas "[t]he First and Seventh Circuits . . . require a showing that there are 'no alternative sites which would solve the problem'") (citations omitted).

Ultimately, the Court determined that "in order to establish a violation of the anti-prohibition clause" T-Mobile was required to show "(1) that a 'significant gap' in its *own* service coverage exists; and (2) that the proposed tower is the 'least intrusive means' of closing that gap (which requires having looked at 'alternative sites which would solve the problem')." (*Id.* at 38) (emphasis in original). (In the Court's view, this standard is consistent with or complimentary to the Eleventh Circuit's specification in *Linet* that the telecommunications provider demonstrate "whether the company can reasonably place a cell site in an alternative location and eliminate the residents' concerns." *Linet*, 408 F.3d at 761–62.)

Applying this test, the Court first found that T-Mobile had provided sufficient evidence of a significant gap in its own service coverage as of 2010 "and up through the date of the last evidence submitted . . . in February 2011." (*Id.* at 43.) The Court also found that "as of 2010" constructing the cell tower at the proposed site was "the least intrusive means for T-Mobile to close the gap in its service coverage." (*Id.* at 47.) The Court therefore granted T-Mobile's Motion for Summary Judgment on the anti-prohibition claim. (*Id.* at 48.)

However, due to the stale status of the evidence in the case given the significant passage of time and a range of other developments, the Court determined that instead of issuing a mandatory injunction the appropriate remedy was to remand the matter to the City to reconsider T-Mobile's application on an expedited basis. (*Id.* at 49, 52.) In doing so, the Court emphasized that in the years that had elapsed since the City denied T-Mobile's application in 2010,

circumstances could have changed such that T-Mobile might no longer have a significant gap in service coverage.[3]  (*Id.* at 50.)  The Court added that there could be additional alternative sites available to T-Mobile, or other opportunities for T-Mobile's co-location on other towers that were not available back in 2010; if that were so, constructing the tower at the proposed location might no longer be the least intrusive means of remedying T-Mobile's coverage gap, assuming that such a gap still existed.  (*Id.* at 50–51.)

After the remand, the City held a public hearing on T-Mobile's application on July 24, 2017 and voted again to deny the application.  (*See* July 24, 2017 City Council Meeting Minutes, Doc. 211-2 at 50–52; July 31, 2017 Denial Letter, Doc. 186-13 at 1.)  The parties filed another round of Motions for Summary Judgment after the City denied the application.  (*See* Docs. 186, 209.)  The central focus of these latest Motions is whether T-Mobile continues to experience a significant gap in coverage and whether the proposed cell tower is still the least intrusive means of remedying that gap under the standard articulated by the Court in the 2016 MSJ Order.

In August 2018, the Court scheduled an evidentiary hearing in connection with the pending summary judgment motions so that the Court could hear directly from the parties' respective experts as the Court found the record confusing.  (Doc. 230 at 3.)  The evidentiary hearing commenced on September 5, 2018, and the

---

[3] At the time of the 2016 MSJ Order, T-Mobile was in the process of merging with Sprint.  As a result of the merger, T-Mobile could have potentially gained enhanced service capabilities that it did not possess back in 2010.  (*See* City's 10/15/21 Brief, Doc. 279 at 3–7.)

Court heard testimony from T-Mobile's expert.  (*See* Docs. 238, 240.)  The evidentiary hearing was continued until October 4, 2018.  (Doc. 243 at 1.)  Then, on September 26, 2018, T-Mobile notified the Court of the FCC's 2018 Declaratory Ruling, *see In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd. 9088 (2018) ("the 2018 Declaratory Ruling" or "the Declaratory Ruling"), and requested that the Court stop the evidentiary hearing because it viewed the new rule as "extremely favorable and legally dispositive to its position in the instant case."  (*See* Doc. 245; Doc. 276 at 1–2.)

## C.     The FCC's 2018 Declaratory Ruling

In the Declaratory Ruling, the FCC clarified its interpretation of Section 332's anti-prohibition clause and explained what legal test should apply to anti-prohibition claims under that provision.[4]  Although the FCC had not previously addressed how claims brought under that particular provision should be analyzed, it had previously interpreted similar language in another section of the same statute — 47 U.S.C. § 253(a).  Much like Section 332's anti-prohibition clause, Section 253's anti-prohibition clause states, "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).  However, unlike Section 332 of

---

[4] The main focus of the Declaratory Ruling was on so-called "small cell deployments" which "have antennas often no larger than a small backpack," Declaratory Ruling ¶ 3, but the implications of the rule appear to apply more broadly.

the TCA, which specifically applies to "personal wireless services," Section 253 applies more broadly to "any interstate or intrastate telecommunications service." *See* Declaratory Ruling ¶ 34 (quoting 47 U.S.C. § 253(a), and 47 U.S.C. § 332(c)(7)(B)(i)(II)).

The FCC had analyzed a claim brought under this latter provision in *California Payphone Association Petition for Preemption of Ordinance No. 576 NS of the City of Huntington park, California Pursuant to Section 253(D) of the Communications Act of 1934*, 12 FCC Rcd. 14191 (1997) ("*California Payphone*"). There, the Commission considered whether a municipal Ordinance regulating payphone providers by requiring payphones on private property to be located indoors "'has the effect of prohibiting' the ability of any entity to provide payphone service" within the meaning of Section 253(a). *Id.* ¶¶ 31, 42. The FCC explained that to make that determination it considers "whether the Ordinance *materially inhibits* or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *Id.* ¶ 31 (emphasis added). Applying that standard to the Ordinance at issue, the FCC concluded, "we do not find that the Ordinance's requirement . . . materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment in the market for payphone services in the Central Business District." *Id.* ¶ 42.

Notably, the FCC's decision in *California Payphone* did not address how anti-prohibition claims should be analyzed under Section 332 of the TCA. And, as

the FCC recognized in the Declaratory Ruling, appellate courts that have addressed anti-prohibition claims in the context of Section 332 have treated those claims differently than how the FCC treated the Section 253 claim in *California Payphone*. Declaratory Ruling ¶ 9. Instead of applying the materially inhibits standard articulated by the FCC in *California Payphone*, these courts have applied variations of the significant gap test, much like this Court did in the 2016 MSJ Order. In light of this split in authorities, and the apparent ambiguity about how anti-prohibition claims should be treated in the context of Section 332, the Declaratory Ruling took "three main actions." *Id.*

First, the Declaratory Ruling took the position that the materially inhibits standard articulated by the FCC in *California Payphone* should apply to claims brought under both Section 253 and Section 332.[5] *Id.* ¶¶ 10, 31. Under this

---

[5] By doing so, the FCC purportedly adopted the same position as the First, Second, and Tenth Circuits. Declaratory Ruling ¶¶ 10, 31. But none of the cases the Declaratory Ruling cited to from those Circuits actually stand for the proposition that *California Payphone*'s materially inhibits standard should also apply to claims raised under Section 332. *See id.* ¶ 34 & n.77 (citing *Puerto Rico Tel. Co. v. Mun. of Guayanilla*, 450 F.3d 9, 18 (1st Cir. 2006), *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002), and *RT Commc'ns v. FCC*, 201 F.3d 1264, 1268 (10th Cir. 2000)). In fact, none of the cases the Declaratory Ruling cited from those Circuits even contain any reference to Section 332. *Perhaps even more significantly, all three of those Circuits have actually reached precisely the opposite conclusion from the one reached by the FCC and expressly held that the significant gap test is the test that should apply to anti-prohibition claims under Section 332. See Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 631 (1st Cir. 2002) ("We have concluded that a town's refusal to permit a tower that is needed to fill a 'significant [geographic] gap' in service, where no service at all is offered in the gap, would violate the effective prohibition clause.") (citations omitted); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999) ("We hold only that the Act's ban on prohibiting personal wireless services precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines."); *AT&T Mobility Servs., LLC v. Vill. of Corrales*, 642 F. App'x 886, 889 (10th Cir. 2016) ("AT & T could prevail on its effective-prohibition claim by showing that (1) the denial of a permit prevented AT & T from closing a 'significant gap' in existing services and (2) its proposed facility was the least intrusive means of doing so."). Indeed, T-Mobile represents that the significant gap test that the FCC rejected in the Declaratory Ruling was the standard that had been "previously articulated

---

standard, "a state or local legal requirement will have the effect of prohibiting wireless telecommunications services" within the meaning of Section 332 "if it materially inhibits the provision of such services." *Id.* ¶ 37.  In an explicit rejection of the significant gap test, the FCC explained, "This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities." *Id.*  The Declaratory Ruling continued, "[A] state or local legal requirement could materially inhibit service . . . not only by rendering a service provider unable to provide an existing service in a new geographic area or by restricting the entry of a new provider in providing service in a particular area, but also by materially inhibiting the introduction of new services or the improvement of existing services." *Id.*  In other words, to establish a violation of the anti-prohibition clause under this interpretation, instead of having to show that it has a significant gap in coverage and that the proposed action is the least intrusive means of closing that gap, a wireless provider would simply have to show that a local government is materially inhibiting it from providing the service that the company "wishes to provide." *Id.* ¶ 40 n.95.

Clearly, the FCC's interpretation of Section 332 applies a standard that is far more friendly to wireless providers than the variations of the significant gap test that had been applied by this Court and other courts across the country. Nevertheless, the FCC took the position that its own reading of the statute, which

---

by *all Circuits*" that had addressed the issue.  (T-Mobile's 10/15/21 Brief, Doc. 278 at 10) (emphasis added).

applies the same materially inhibits standard to the anti-prohibition clauses in both Section 253 and Section 332, "is consistent with the basic canon of statutory interpretation that identical words appearing in neighboring provisions of the same statute generally should be interpreted to have the same meaning." *Id.*¶ 36. In addition, the FCC contended that this interpretation is consistent with the TCA's statutory purpose of promoting competition and encouraging rapid deployment of new technologies. *See id.* ¶ 38 ("To limit Sections 253(a) and 332(c)(7)(B)(i)(II) to protecting only against coverage gaps or the like would be to ignore Congress's contemporaneously-expressed goals of 'promot[ing] competition[,] ... secur[[[[ing] ... higher quality services for American telecommunications consumers and encourage[ing] the rapid deployment of new telecommunications technologies.'") (alterations in original).  By comparison, the FCC asserted that the significant gap test applied by other courts reflects "an unduly narrow reading of the statute and an outdated view of the marketplace." *Id.* ¶ 40.

In the next two parts of the Declaratory Ruling, the FCC discussed some of the practical implications of its interpretation of Section 332's anti-prohibition clause.  Specifically, it addressed what types of fee and non-fee requirements imposed by localities could satisfy the materially inhibits standard in the context of deploying wireless infrastructure, particularly in the context of small wireless facilities. *Id.* ¶¶ 11–12, 32–33, 43–91.

In the component of the Declaratory Ruling addressing fee requirements, the FCC emphasized that certain types of fees imposed by localities could

potentially run afoul of Section 332's anti-prohibition clause.  *Id.* ¶¶ 11, 32, 43–80. And it took the position that, under the materially inhibits standard, "fees are only permitted to the extent that they represent a reasonable approximation of the local government's objectively reasonable costs, and are non- discriminatory."[6] *Id.* ¶ 32. Against that backdrop, the Declaratory Ruling stated that fees imposed by localities would violate Section 332's anti-prohibition clause unless three conditions are met:  "(1) the fees are a reasonable approximation of the state or local government's costs, (2) only objectively reasonable costs are factored into those fees, and (3) the fees are no higher than the fees charged to similarly-situated competitors in similar situations."  *Id.* ¶ 50 (footnote omitted).

Finally, the Declaratory Ruling explained what types of non-fee restrictions such as aesthetic restrictions constitute a prohibition or services under Sections 253 and 332.  *See id.* ¶¶ 12, 33, 81–91.  In the process, the FCC expressly recognized that "certain reasonable aesthetic considerations do not run afoul of Sections 253 and 332."  *Id.* ¶ 12.  The Declaratory Ruling provided that localities can impose aesthetic requirements on wireless providers as long as they are "(1) reasonable, (2) no more burdensome than those applied to other types of infrastructure deployments, and (3) objective and published in advance."  *Id.* ¶ 86.

In its discussion of the first condition, the FCC explained that aesthetic restrictions are "reasonable" for purposes of Section 332 if they "are technically

---

[6] The Declaratory Ruling also identified "specific fee levels for the deployment of Small Wireless Facilities that presumptively comply with this standard."  Declaratory Ruling ¶ 32.

feasible and reasonably directed to avoiding or remedying the intangible public harm of unsightly or out-of-character deployments." *Id.* ¶ 87.  With respect to the second condition, the FCC stated, "[A]esthetic requirements that are more burdensome than those the state or locality applies to similar infrastructure deployments are not permissible, because such discriminatory application evidences that the requirements are not, in fact, reasonable and directed at remedying the impact of the wireless infrastructure deployment." *Id.*  Lastly, with regard to the third condition, the Declaratory Ruling stated, "[I]n order to establish that they are reasonable and reasonably directed to avoiding aesthetic harms, aesthetic requirements must be objective—*i.e.*, they must incorporate clearly-defined and ascertainable standards, applied in a principled manner—and must be published in advance." *Id.* ¶ 88.

### D.    Additional Procedural Developments

Upon receiving notice of the Declaratory Ruling, the Court held a teleconference with the parties and granted T-Mobile's request for a continuance of the evidentiary hearing so that the parties could submit briefs about the implications of the FCC's new rule.  (S*ee* Doc. 276 at 1–2.)  Further complicating matters, in the ensuing months, numerous state and local government entities filed legal challenges to the Declaratory Ruling in various forums across the country.  (*Id.* at 2.)  These cases were eventually consolidated into a single action before the Ninth Circuit.  (*Id.*)  Meanwhile, a number of these entities filed a petition for reconsideration of the Declaratory Ruling with the FCC challenging certain

discrete aspects of the rule.  (*See* Doc. 260-1.)  Based on these developments, the Court issued an order administratively closing the case on November 19, 2018. (Doc. 251.)  Then, on April 10, 2019, the Court issued a follow-up order holding the case in abeyance while the status of the Declaratory Ruling and the various legal challenges remained uncertain.  (Doc. 263 at 3.)

On August 12, 2020, the Ninth Circuit ruled on the consolidated challenge in *City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020).  Importantly, the Ninth Circuit did not address the validity of the FCC's interpretation of Section 332 in the first part of the Declaratory Ruling; however, it did consider the fee- and aesthetic-based conditions that the FCC had imposed in the other two parts in a manner that has potential implications for this case.  Although the Ninth Circuit upheld the conditions the FCC had imposed on municipalities' ability to impose fees, it struck down two of the three aesthetic conditions — the condition that aesthetic requirements must be "no more burdensome than those applied to other types of infrastructure deployments" and the condition that the requirements must be "objective and published in advance."  *Id.* at 1041.  The Ninth Circuit found that these two conditions "plac[ed] a limitation on local zoning authority that departs from the explicit directive of Congress in section 332."  *Id.*  But it upheld the condition that the aesthetic requirements imposed by municipalities must be reasonable, finding that the condition was "consistent with [Ninth Circuit] case law, as well as congressional intent in enacting Sections 253 and 332, and [was] not unduly vague or overbroad."  *Id.* at 1042.  The municipalities filed a petition

for certiorari, but the Supreme Court denied the petition on June 28, 2021. *See City of Portland v. F.C.C.*, 141 S. Ct. 2855 (2021).

At this stage, it does not appear that the FCC has taken any action on the petition for reconsideration and there is no indication that it will act on the petition at any point in the near future. Although the parties dispute whether the petition seeks to overturn any components of the Declaratory Ruling that are necessary to resolving this matter, neither party takes the position that the Court should continue to wait on the FCC to act before proceeding to resolve their Motions for Summary Judgment.[7]

Following a series of status updates from the parties, the Court reopened the case via docket entry on November 17, 2022. Afterwards, the Court held a teleconference on November 28, 2022 and directed the parties to file additional supplemental briefs advising the Court of how it should proceed to resolve the parties' cross-motions for summary judgment, which remain pending. (Doc. 281.) On January 24, 2023, the Court directed the parties to file Responses to the briefs submitted by opposing counsel. *See* Jan. 24, 2023 Docket Order. The parties filed their Responses on January 31, 2023. (Docs. 285, 286.)

---

[7] T-Mobile emphasizes that the petition for reconsideration "does not raise the FCC's rejection of the 'significant gap' standards previously used by courts." (T-Mobile's 10/15/21 Brief at 9.) It represents that the petition only seeks reconsideration of unrelated issues such as the creation of new "shot clock" rules and regulations on providers' access to public rights of way. (*Id.* at 9–10.) The City disagrees with T-Mobile's assertion that the petition for reconsideration does not raise relevant issues because it says the petition contains an argument that the FCC's definition of effective prohibition is overly broad. (*See* City's 1/24/23 Resp., Doc. 285 at 2.) However, the City concedes that at this point the FCC seems unlikely to take action on the petition. (*Id.* at 2–3.)

## III.   Discussion

### A.      Preliminary Matters

The question currently before the Court is whether the City's decision to deny T-Mobile's application should be assessed based on the significant gap test articulated in the 2016 MSJ Order or the materially inhibits standard set forth in the 2018 Declaratory Ruling.  The parties' primary point of contention for purposes of answering that question is whether it would be permissible for the Court to retroactively apply the materially inhibits standard to the City's decision given that the 2018 Declaratory Ruling was not issued until after the City made its decision in 2017.  However, the City raises an alternative argument that even if the 2018 Declaratory Ruling could otherwise be applied retroactively, the Court should still decline to follow it because it reflects an unreasonable interpretation of Section 332's anti-prohibition clause that is not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[8]  If, as the City argues, the Court should decline to follow the rule on that ground, then the Court would not even have to reach the issue of whether the rule could otherwise be applied retroactively because the Court would not be bound to follow

---

[8] As the Supreme Court has explained,

> *Chevron* established a familiar two-step procedure for evaluating whether an agency's interpretation of a statute is lawful. At the first step, we ask whether the statute's plain terms "directly addres[s] the precise question at issue." 467 U.S., at 843, 104 S.Ct. 2778. If the statute is ambiguous on the point, we defer at step two to the agency's interpretation so long as the construction is "a reasonable policy choice for the agency to make." *Id.*, at 845, 104 S.Ct. 2778.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005).

the rule either way. The reasonableness of the FCC's interpretation is therefore an important threshold consideration.

In the City's view, the FCC's interpretation is unreasonable because it replaces the significant gap test with an "extremely broad and subjective" test that flouts Congress's intent to preserve local government zoning authority. (City's 1/24/23 Resp., Doc. 285 at 5.) The City contends that the FCC's test "specifically denies local governments the ability to inquire into the need for any proposed facility and instead focuses only on what services the provider wishes to provide, what capabilities the provider seeks to incorporate, what performance and quality levels the provider wishes to attain, and what facilities the provider seeks to deploy." (*Id.* at 10) (citing Declaratory Ruling ¶ 40 n.95). By doing so, the City argues that the rule makes the wireless provider "the sole arbiter of what is a material inhibition" and effectively acts as a rubber stamp for whatever the provider requests instead of balancing the provider's needs against the municipality's legitimate zoning interests. (*Id.*) The City therefore contends that the Court should decline to follow the 2018 Declaratory Ruling and apply the significant gap test instead.

In contrast, T-Mobile claims that the Court should defer to the FCC's interpretation under *Chevron* because it is the correct interpretation of Section 332's anti-prohibition clause. In T-Mobile's view, the materially inhibits standard is consistent with Congress's intent to limit local government authority. T-Mobile adds that the Court already deferred to an FCC interpretation of the same statutory

provision in the 2016 MSJ Order when it deferred to the FCC's rejection of the one-provider rule in the 2009 Declaratory Ruling, (MSJ Order at 36) (citing *In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance*, 24 FCC Rcd. 13,994 ¶ 56 (2009) ("2009 Declaratory Ruling")), and it suggests that the Court should follow that same approach here.

In addition, T-Mobile argues that notwithstanding the City's *Chevron* arguments the Court is required to defer to the FCC's interpretation under the Eleventh Circuit's decision in *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014). In *Mais*, the Eleventh Circuit found that the district court in that case "exceeded its jurisdiction by declaring [a] 2008 FCC Ruling to be inconsistent with the TCPA." *Id.* at 1119. As the court explained, "Section 402(a) of the Communications Act provides that (except in limited circumstances not relevant here) any 'proceeding to enjoin, set aside, annul, or suspend any order of the Commission' must be brought under the Hobbs Act," *id.* (citing 47 U.S.C. § 402(a)), and "[t]he Hobbs Act, in turn, expressly confers on the federal courts of appeals 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of' such FCC orders," *id.* (citing 28 U.S.C. § 2342). The court interpreted those two statutory provisions to mean that "[b]y refusing to enforce the FCC's interpretation, the district court exceeded its power" because "[d]eeming agency action invalid or ineffective is precisely the sort of review that

the Hobbs Act delegates to the courts of appeals in cases challenging final FCC orders." *Id.* at 1119–20 (quoting *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 448 (7th Cir. 2010)).  In other words, the court broadly held in *Mais* that "district courts lack jurisdiction to consider claims to the extent they depend on establishing  that all or part of an FCC order subject to the Hobbs Act is 'wrong as a matter of law' or is 'otherwise invalid.'"  *Id.* at 1120 (quoting *Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 462 (11th Cir. 2012)); *see id.* at 1121 ("In short, we hold that the district court was without jurisdiction to consider the wisdom and efficacy of the 2008 FCC Ruling.").

As a starting point, the Court is inclined to agree with the City that the 2018 Declaratory Ruling reflects an unreasonable interpretation of Section 332.  Not only does the FCC's interpretation conflict with the interpretations of every Circuit that has addressed the issue and expand *California Payphone* to new contexts in which it had not been previously applied,[9] it also appears to upset the balanced

---

[9] For purposes of comparison, Section 253's anti-prohibition clause is qualified by an additional subsection stating, "Nothing in this section affects the authority of a State or local government *to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers*, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."  47 U.S.C. § 253(c) (emphasis added).  By comparison, Section 332's anti-prohibition clause contains a subsection devoted more broadly to "Preservation of local zoning authority," which states, "Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof *over decisions regarding the placement, construction, and modification of personal wireless service facilities*."  47 U.S.C. § 332(7)(A) (emphasis added).  Section 332 is implicated in this case because it involves a wireless provider's proposal to construct a cell tower and the provider's challenge to the locality's decision to deny that request as an exercise of its local zoning authority under 47 U.S.C. § 332(7)(A) and not, for example, a provider's challenge to a locality's imposition of fees as a condition for use of a public right of way, *see, e.g.*, *Puerto Rico Tel. Co.*, 450 F.3d; *TCG New York, Inc.*, 305 F.3d.

regulatory approach that was intended by Congress.  Instead of accommodating the needs of wireless providers in a manner that would simultaneously preserve local government zoning authority, the FCC's interpretation would "strip State and local authorities of their Section 332(c)(7) zoning rights" and "effectively nullify local authority by mandating approval of all (or nearly all) applications."  2009 Declaratory Ruling ¶ 60.  Although the Eleventh Circuit has not squarely addressed Section 332's anti-prohibition clause, the FCC's new rule also potentially runs afoul of established Eleventh Circuit case law holding that when evaluating cell tower applications under Section 332, local governments are authorized to consider a variety of factors including "the proposed tower's negative aesthetic impact (as well as its effect on property values) and the proposed tower's effect on the health, safety, and welfare of the public," *Am. Tower*, 295 F.3d at 1208, and whether "an alternative location [is] unavailable or unfeasible," *Linet*, 408 F.3d at 762.

But as T-Mobile argues, *Mais* holds that this Court cannot determine that the Declaratory Ruling is not subject to *Chevron* deference — only the Eleventh Circuit can do that in the first instance.  The City does not respond to this argument and subsequent cases from the Eleventh Circuit support T-Mobile's interpretation. *See Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1103 (11th Cir. 2019) ("In *Mais*, we interpreted the Hobbs Act's grant of exclusive jurisdiction to the courts of appeals as stripping district courts of any power to consider the validity of the Commission's orders—in facial, preenforcement challenges to an agency order *and* private civil enforcement actions in which a party contests the order.")

(emphasis in original); *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1307 (11th Cir. 2015) (noting that "[d]istrict courts may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation" and finding "[t]he district court rightly refused to consider Mr. Murphy's argument that the 1992 FCC Order's interpretation was inapplicable and contrary to the plain language of the TCPA because the effect would be to 'set aside, annul, or suspend' the FCC Order and thus a violation of the Hobbs Act").

However, as T-Mobile itself recognizes, *Mais* has been subject to significant criticism in recent years. Significantly, three members of the Eleventh Circuit have agreed in a unanimous concurring opinion that *Mais* should be reversed. *See Gorss*, 931 F.3d at 1106 (Pryor J., concurring) ("The Hobbs Act, correctly construed, does not require district courts adjudicating cases within their ordinary jurisdiction to treat agency orders that interpret federal statutes as binding precedent. Our precedents' interpretation of the Hobbs Act ignores the statutory context, generates absurd results, and raises serious constitutional doubts. In the earliest appropriate case, we should correct our mistake en banc."); *see also Weister v. Vantage Point AI, LLC*, No. 8:21-cv-1250, 2022 WL 3139373, at *5 (M.D. Fla. Aug. 3, 2022) ("*Gorss* reasons that by committing to the circuit courts the 'exclusive jurisdiction' to 'enjoin, set aside, suspend,' or 'determine the validity' of a final order of the FCC, the Hobbs Act prevents a district court's enjoining or vacating a final order of the FCC but does not limit a district court's interpreting the TCPA as applied in litigation between private parties."). But for now, the Court

26

is bound to apply *Mais*'s holding. *See Weister*, 2022 WL 3139373, at *6 ("Although *Gorss* persuades that *Mais* and *Self* incorrectly interpret the Hobbs Act (or correctly interpret the Hobbs Act but fail to confront the act's contingent unconstitutionality), *Gorss* confirms that *Mais* and *Self* govern in the Eleventh Circuit.").

Accordingly, the Court will proceed to address whether the 2018 Declaratory Ruling can be applied retroactively.

**B.     Whether the 2018 Declaratory Ruling Is Interpretive or Substantive**

To determine whether the 2018 Declaratory Ruling can be applied retroactively, the Court must first ascertain whether the rule "merely clarifies the prior law" or "effects a substantive change in the legal standard." *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1283 (11th Cir. 1999).  In other words, the question is whether the rule is an interpretive rule that can be applied retroactively or a substantive rule that cannot.  An interpretive rule is one that "'typically reflects an agency's construction of a statute that has been entrusted to the agency to administer' and does not '*modif[y]* or *add[ ]* to a legal norm based on the agency's *own authority.*"  *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (emphasis in original) (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94–95 (D.C. Cir. 1997)).  By comparison, a substantive rule is one that "creates new law, rights, or duties."  *Id.*  If the rule is interpretive because it "clarifies prior law rather than changing it" then "no concerns about retroactive application arise and the

amendment is applied to the present proceeding as an accurate restatement of prior law." *Piamba Cortes*, 177 F.3d at 1283.   Consequently, "concerns about retroactive application are not implicated when an amendment that takes effect after the initiation of a lawsuit" is an interpretive rule that "is deemed to clarify relevant law rather than effect a substantive change in the law." *Id.*   On the other hand, if the rule is substantive, then the "the traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment" applies.   *Landgraf v. USI Film Prods.*, 511 U.S. 244, 1504 (1994); *see Gummala v. U.S. Dep't of Labor*, No. 20-12839, 2022 WL 881210, at *3 (11th Cir. Mar. 25, 2022).

As the agency authorized to administer the TCA, the FCC is authorized to issue substantive rules to effectuate the provisions of the Act.   *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290 (2013) (noting that "Section 201(b) of that Act empowers the Federal Communications Commission to 'prescribe such rules and regulations as may be necessary in the public interest to carry out [its] provisions'") (citing 47 U.S.C. § 201(b)).   But the FCC also has the inherent authority to issue interpretive rules.   *See* 2 Fed. Proc., L. Ed. § 2:74 ("It is well established that an agency charged with the duty to enforce or administer a statute has inherent authority to issue interpretative rules informing the public of the procedures and standards it intends to apply in exercising its discretion and of the agency's construction of the statutes or regulations that it administers.") (footnotes omitted).   In this case, the City argues that the 2018 Declaratory Ruling should be

treated as a substantive rule and retroactivity concerns are implicated because the rule substantively changes the governing legal standard.  And T-Mobile argues that no retroactivity concerns would be implicated if the Court were to apply the Declaratory Ruling to this matter because it is merely an interpretive rule clarifying existing statutory language.

To determine whether a rule is interpretive or substantive, two factors that the courts in the Eleventh Circuit considers are (1) whether the agency itself describes the rule as a clarification rather than a new substantive rule, and (2) whether the statutory language that the agency is supposedly clarifying is ambiguous.  *See Heimmermann v. First Union Mortg*., 305 F.3d 1257, 1260 (11th Cir. 2002); *Piamba Cortes*, 177 F.3d at 1283–84.

On the first factor, T-Mobile emphasizes that the FCC itself has described the Declaratory Ruling as a clarification, which the Eleventh Circuit has said is a factor that "is generally given much weight."  *Heimmermann*, 305 F.3d at 1260; *see Scoma Chiropractic, P.A. v. Dental Equities, LLC*, No. 2:16-cv-41, 2021 WL 6105590, at *8 (M.D. Fla. Dec. 23, 2021).  Granted, the FCC describes its reading of the effective prohibition language in Section 332 as a "clarifying interpretation" at points throughout the Declaratory Ruling, *see* Declaratory Ruling ¶ 21, and it also states that the impetus for the rule is to "*clarify* the preemptive scope that Congress intended," *see id*. ¶ 23 (emphasis added).  That said, the Court should not simply defer to the FCC's purported characterization of the Declaratory Ruling as a clarification because otherwise "an agency could make a substantive change

merely by referring to a new interpretation as a 'clarification.'" *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).   In this case, although the FCC describes the Declaratory Ruling as a clarification, it also describes it as an "update" to its approach, which suggests that the rule is doing more than simply clarifying an ambiguous statutory provision by interpreting the law as it has always been.  *See* Declaratory Ruling ¶ 30 ("[W]e take this opportunity to clarify *and update* the FCC's reading of the limits Congress imposed.") (emphasis added); *see also id.* ¶ 34 n.74 ("The actions in this proceeding *update the FCC's approach* to Sections 253 and 332 . . . .") (emphasis added).  If the Declaratory Ruling is an "update" to the FCC's "approach" then that suggests that the FCC is not only providing a clarifying interpretation of the TCA but also issuing new substantive rules.  Thus, it is not clear that the FCC actually sought for the Declaratory Ruling to be merely interpretive.

Notably, the 2018 Declaratory Ruling is broken down into three parts — some of which plainly appear substantive in nature.  And even if the first part of the Declaratory Ruling is purely interpretive in that it merely provides a clarifying interpretation of statutory language, the interpretive part still has substantial overlap with the two more substantive parts of the rule that "explain how this 'material inhibition' standard applies in the context of state and local fees and aesthetic requirements."  Declaratory Ruling ¶ 35.  In those latter two parts, the FCC — under the guise of merely explaining how its new interpretation operates in

30

practice — adds new substantive restrictive conditions on localities' ability to impose fee and aesthetic requirements on carriers' requests pursuant to paragraphs 43 through 91 of the rule.

A rule must be treated as substantive rather than merely interpretive when the agency is attempting to "supplement" the statute rather than "simply to construe it." *Chamber of Commerce of the U.S. v. OSHA*, 636 F.2d 464, 469 (D.C. Cir. 1980). One way in which an agency might potentially supplement a statute is by imposing "additional conditions" on regulated parties. *See United States v. Picciotto*, 875 F.2d 345, 346, 348 (D.C. Cir. 1989) (finding that Park Service rule that "impose[d] new substantive restrictions uniformly on all demonstrators in any national capital region park" was substantive rather than interpretive because it imposed "additional conditions" on demonstrators and "an interpretive rule explains an existing requirement; it does not impose an 'additional' one"). The FCC attempts to frame the latter two parts of the 2018 Declaratory Ruling as simply a clarification of how its new interpretation of Section 332 would apply in specific contexts, such that it could still potentially fall within an interpretive umbrella. But in the process of explaining how its new interpretation applies in the context of fee- and aesthetic-based restrictions, the FCC seems to be supplementing — rather than interpreting — the TCA. *See, e.g.*, *City of Portland*, 969 F.3d at 1037 (noting that the Declaratory Ruling "*places conditions* on fees above a certain level to avoid

preemption") (emphasis added).  By doing so, the FCC appears to be exercising its legislative authority to issue substantive rules or restrictions.[10]

For purposes of comparison, in *Pope v. Shalala*, 998 F.2d 473 (7th Cir. 1993), which the Eleventh Circuit relied on in *Heimmermann*, the court concluded that "[t]he sole purpose of the regulations was to clarify the law on the evaluation of pain" for purposes of the Social Security Act's disability regulations, and noted that the rules at issue expressly stated, "these final rules make no substantive change in our policy."  *Id.* at 482–83.  The 2018 Declaratory Ruling made no such qualification.

In support of its argument that the rule should be treated as substantive, the City emphasizes that three other district courts have already found that the FCC's Declaratory Ruling is a substantive rule that should not be applied retroactively to similar decisions made by other localities.  *See Eco-Site LLC v. County of Pueblo*, 431 F. Supp. 3d 1231, 1238–39 (D. Colo. 2019); *New Cingular Wireless PCS LLC v. Zoning Bd. of Adjustment of the Borough of N. Haledon*, 469 F. Supp. 3d 262, 278 (D.N.J. 2020); *T-Mobile, Ne., LLC v. City of Wilmington, Del.*, No. 16-1108, 2020 WL 1245306, at *6 (D. Del. Mar. 16, 2020).  The City notes that two of those cases, *New Cingular* and *T-Mobile Northeast, LLC* found that the Declaratory

---

[10] The new aesthetic conditions that the FCC imposed on localities are particularly relevant to this case given that the City's rationale for denying T-Mobile's application was largely aesthetics in combination with property value concerns.  The Ninth Circuit invalidated two of the three new FCC aesthetic limiting conditions in *City of Portland*.  However, even if that decision were binding on this Court and those two requirements were no longer considered part of the rule, the reasonableness requirement that the Ninth Circuit upheld could arguably be considered a new substantive condition given that it requires courts to assess the reasonableness of localities' aesthetic restrictions based on a materially different standard.

Ruling substantively changed the law instead of clarifying it because it departed from the significant gap/least intrusive means standard that had been adopted in the Third Circuit.  According to those two courts, the Declaratory Ruling departed from that standard by concluding that to establish effective prohibition the provider only needs to show that the denial materially inhibits it from improving its service instead of having to show that it has a significant gap in coverage and that its own proposal is the least intrusive means of remedying that gap.  The City argues that this Court followed the same Third Circuit standard when it adopted the significant gap/least intrusive means test in the 2016 MSJ Order.  For that reason, the City contends that the Declaratory Ruling substantively changed the law in this case just like in *New Cingular* and *T-Mobile Northeast, LLC* and it should therefore be treated as a substantive rule.

But this case is not that straightforward.  Unlike this case, each of the three district court decisions the City references hinged on the fact that the relevant Circuits had adopted the significant gap/least intrusive means test, meaning that the Declaratory Ruling conflicted with binding in-Circuit authority and would substantively change the law in those jurisdictions.  *See Eco-Site LLC*, 431 F. Supp. 3d at 1236–37; *New Cingular*, 469 F. Supp. 3d at 277–78; *T-Mobile, Ne., LLC*, 2020 WL 1245306, at *6.  In each of those jurisdictions, the relevant Circuit had held that the statutory language *unambiguously* meant something other than what the FCC had said it did. Therefore, from the perspective of those three district courts, the FCC was not simply clarifying *ambiguous* statutory language; it was

substantively changing the law surrounding language that the relevant Circuit had deemed to be *unambiguous*.

This Court is faced with a somewhat different situation because the relevant Circuit in this jurisdiction — the Eleventh Circuit — has never had the opportunity to directly address the ambiguous statutory language at issue. At the same time, the FCC's new interpretation has far-reaching implications that potentially run afoul of Eleventh Circuit case law on related statutory issues pertaining to local governments' consideration and denial of cell tower applications. For instance, the Eleventh Circuit has established clear precedent recognizing the broad authority vested in local governments to review and deny cell tower applications under Section 332 based on their consideration of aesthetic objections in tandem with concerns regarding the impact of the proposal on property values or safety. *See Linet*, 408 F.3d at 761–62; *Am. Tower*, 295 F.3d at 1208–09. Moreover, Eleventh Circuit precedent clearly provides that it is the applicant's burden "to show that an alternative location was unavailable or unfeasible" — a requirement that the 2018 Declaratory Ruling would effectively erase. *Linet*, 408 F.3d at 762. In that regard, the 2018 Declaratory Ruling seemingly "does disavow controlling precedent" in this Circuit. *Eco-Site LLC*, 431 F. Supp. 3d at 1236–37.

Separately, in the January 31, 2023 Response brief the City argues that the FCC's interpretation in the 2018 Declaratory Ruling also substantively changes the law — in this Circuit as well as in others — because it represents a departure from the FCC's 2009 Declaratory Ruling that also interpreted Section 332 of the TCA,

34

albeit in a slightly different context. As the Court explained in the 2016 MSJ Order, in the 2009 Declaratory Ruling the FCC rejected an approach to resolving anti-prohibition claims known as the "one-provider" rule, which "holds that a significant gap exists only if 'the area the new facility will serve is not already served by another provider.'" (2016 MSJ Order at 36) (citing *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999), and *APT Pittsburgh Ltd. P'Ship v. Penn Township Butler Cnty. of Pa.*, 196 F.3d 469, 480 (3d Cir. 1999)). Instead, the 2009 Declaratory Ruling seemed to endorse the "multi-provider" approach, which "holds that a significant gap in coverage exists 'if the *provider in question* is prevented from filling a significant gap *in its own* service network." (*Id.*) (emphasis in original) (citing *MetroPCS, Inc. v. City & Cnty. of S.F.*, 400 F.3d 715, 732 (9th Cir. 2005), *abrogated on other grounds by T. Mobile S., LLC v. City of Roswell, Ga.*, 135 S. Ct. 808 (2015)). The FCC's rationale was "the fact that another carrier or carriers provide service to an area is an inadequate defense under a claim that a prohibition exists" and that "any other interpretation of this provision would be inconsistent with the Telecommunications Act's pro-competitive purpose." 2009 Declaratory Ruling ¶ 56. The Commission therefore concluded, "we construe the statute to bar State and local authorities from prohibiting the provision of services of individual carriers solely on the basis of the presence of another carrier in the jurisdiction," and added, "State and local authority to base zoning regulation on other grounds is left intact by this ruling." *Id.* ¶ 60.

The City appears to suggest that the 2009 Declaratory Ruling implicitly endorsed the significant gap test. *See, e.g.*, *id.* ¶ 61 (stating that an alternative interpretation to the one-provider rule "could perpetuate significant coverage gaps within any individual wireless provider's service area and, in turn, diminish the service provided to their customers"); *id.* ¶ 59 n.179 (stating that "[t]o the extent a wireless carrier has gaps in its service, a zoning restriction that bars additional carriers will cement those gaps in place and effectively prohibit any consumer from receiving service in those areas"). And the City notes that the FCC expressly found that localities could deny applications based on the availability of opportunities for co-location, *see id.* ¶ 62, which was a component of the test that this Court adopted in the 2016 MSJ Order. Although the 2018 Declaratory Ruling may not have directly contradicted the 2009 Declaratory Ruling,[11] as the City suggests, it appears to reflect a marked change in direction for the FCC.

The Court also finds it noteworthy that in the process of addressing its views regarding Sections 332 and 253, the FCC effectively created a legislative sea change by overriding the unambiguous consensus of every other Circuit that has addressed the issue — that effective prohibition should be assessed based on some iteration of the significant gap test. *See T-Mobile, Ne., LLC*, 2020 WL 1245306 at *6 ("Application of the new standard is an abrupt departure from a well-established

---

[11] The 2009 Declaratory Ruling did not squarely address whether the plaintiff provider has to make a threshold showing that it has a significant gap in coverage in order to be successful on an anti-prohibition claim related to its own service, which was the issue that the FCC addressed more directly in the 2018 Declaratory Ruling.

practice in the Third Circuit *as well as in other circuits*.") (emphasis added); (*see also* T-Mobile's 10/15/21 Brief, Doc. 278 at 10) (stating that the Declaratory Ruling "held that the 'significant gap' standards *previously articulated by all Circuits* was incorrect and premised on an inaccurate understanding of modern wireless services and technologies") (emphasis added).   Indeed, the Declaratory Ruling expressly states that it aims to "resolve the conflicting court interpretations of the 'effective prohibition' language so that continuing confusion on the meaning of Sections 253 and 332(c)(7*) does not materially inhibit the critical deployments of Small Wireless Facilities and our nation's drive to deploy 5G*."  *See* Declaratory Ruling ¶ 35 (emphasis added).   Hence, the FCC's decision to override the interpretations of other Circuits through its own clarifying interpretation of the TCA was driven by a specific policy rationale — facilitating the transition to 5G technology without local government interference.   And the FCC itself recognized that implementing this material change for the purpose of facilitating the transition to 5G technology was a fundamentally legislative process that should be informed by notice and comment rulemaking — a process that is not required for interpretive rules.  *See* 5 U.S.C. §§ 553(b)(A), (d)(2).[12]

The City also notes that the "Ordering Clauses" subsection of the Declaratory Ruling includes an effective date.  *See* Declaratory Ruling ¶ 153.  According to the

---

[12] As the D.C. Circuit has recognized, "an agency seems likely to have intended a rule to be legislative if it has the rule published in the Code of Federal Regulations" because "44 U.S.C. § 1510 limits publication in that code to rules 'having general applicability and legal effect'." *Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (quoting *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) (Scalia, J.)).

City, this is indicative of the FCC's intent for the 2018 Declaratory Ruling to be a substantive rule because, as the Eleventh Circuit has acknowledged, it typically would not be necessary for an agency to include an effective date for a rule that was intended to be merely interpretive. *See Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1351 (11th Cir. 2005) ("There is no point in specifying an effective date if a provision is to be applied retroactively.").  In response, T-Mobile notes that the Ordering Clauses subsection merely indicates that the Third Report & Order ("R&O") setting new shot clock rules that was issued concurrently with the Declaratory Ruling is effective 90 days after publication in the federal register, and that the Declaratory Ruling is effective the same day as the R&O.  Based on that fact, T-Mobile contends that the FCC made the effective date for the 2018 Declaratory Ruling the same as the effective date for the R&O simply as a matter of administrative efficiency.  That may be so to some extent, but, fundamentally, the new rules contained within both the R&O and the 2018 Declaratory Ruling seem to be part of the same broader legislative effort.

Moreover, even if clarifying the meaning of Section 332's anti-prohibition clause was one purpose of the rule, the opening paragraph of the Declaratory Ruling indicates that another purpose of the FCC's action — perhaps the main, overarching purpose — was to remove regulatory barriers to facilitate a transition to 5G technology.  *See* Declaratory Ruling ¶ 1 ("America is in the midst of a transition to the next generation of wireless services, known as 5G. . . . Today's action is the next step in the FCC's ongoing efforts to remove regulatory barriers

that would unlawfully inhibit the deployment of infrastructure necessary to support these new services."); *see also id.* ¶ 6 ("We thus find that now is the appropriate time to move forward with an approach geared at the conduct that threatens to limit the deployment of 5G services."). This suggests that the Declaratory Ruling was not simply an effort by the FCC to eliminate uncertainty about the law by clarifying ambiguous statutory language; it was part of a broader effort to issue a package of new substantive rules based on changed circumstances. *Cf. Syncor Int'l Corp.*, 127 F.3d at 95–96 ("This is not a change in interpretation or in enforcement policy, but rather, is fundamentally new regulation. The reasons FDA has advanced for its rule—advancement in PET technology, the expansion of procedures in which PET is used, and the unique nature of PET radiopharmaceuticals—are exactly the sorts of changes in fact and circumstance which notice and comment rulemaking is meant to inform.").

All things considered, the Court finds that the Declaratory Ruling should be treated as a substantive rule.

## C.    Retroactive Effect

The next question for the Court to address is whether the 2018 Declaratory Ruling is the type of substantive rule that would have an impermissibly retroactive effect if it were applied in the matter at hand.

In the City's view, the application of the FCC's new rule to its decision in 2017 would have an impermissibly retroactive effect because the FCC issued the new rule *after* the City denied T-Mobile's application in 2017. The City emphasizes

39

that "[r]etroactivity is not favored in the law," and that it would be unfair to subject the City to a new standard that the City did not have notice of at the time of its decision. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

Relying on *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), the City argues that when assessing retroactivity courts should take into account considerations of "fair notice, reasonable reliance, and settled expectations." *Id.* at 270. As the Supreme Court explained in *Landgraf*, "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* at 265. Applying these principles, the City argues that at the time it made its decision it had a reasonable expectation that its decision would be governed by the significant gap/least intrusive alternative test. The City emphasizes that the 2016 MSJ Order never mentioned the materially inhibits standard — in fact, it expressly directed the City to review the application based on the significant gap test. Under the circumstances, the City asserts that applying a new standard that "grants carriers greater substantive rights at the expense of the local municipal government," (City's 10/15/21 Brief, Doc. 279 at 10) (quoting *T-Mobile, Ne., LLC*, 2020 WL 1245306, at *6), would upset the City's settled expectations. Therefore, consistent with the principles articulated in *Landgraf*, the City contends that applying the materially inhibits test to its decision in 2017 would have an impermissibly retroactive effect. The City notes that the district courts in *Eco-Site*, *New Cingular*, and *T-Mobile Northeast, LLC*, all refused to

apply the rule retroactively on similar grounds. *See Eco-Site LLC*, 431 F. Supp. 3d at 1238 (noting that "the Declaratory Ruling is an abrupt departure from well-established practice" and adding that "application of the Declaratory Ruling would require, in the view of Defendant Pueblo County's attorney, the granting of Plaintiff's permit applications" and that "[t]his is a significant burden on Defendant Pueblo County") (footnote omitted); *New Cingular*, 469 F. Supp. 3d at 277–78 (finding that the 2018 Declaratory Ruling was "an alteration of existing rights and obligations" and applying it to the locality's decision "would therefore be an impermissible retroactive application"); *T-Mobile, Ne., LLC*, 2020 WL 1245306, at *6 (noting that "th[e] new standard grants carriers greater substantive rights at the expense of the local municipal government" and refusing to apply it retroactively because the rule "makes substantive changes to the law and alters existing obligations").

As further support, the City cites the Eleventh Circuit's decision in *Gummala v. U.S. Department of Labor*, No. 20-12839, 2022 WL 881210 (11th Cir. Mar. 25, 2022). There, the Court considered a rule issued by the Department of Labor implementing provisions of the Seamen's Act, which prohibits employers from discharging seamen for reporting suspected safety violations. *Id.* at *1. The plaintiff in *Gummala* would have qualified as a "seamen" for purposes of the Seamen's Act if he was employed on board a vessel owned by a citizen of the United States. *Id.* At the time the lawsuit was filed, the Defendant, Carnival Cruise Lines, Inc., did not qualify as a citizen of the United States under the definition

promulgated by the Department of Labor in 2013.  *Id.*  However, in 2016, after the lawsuit had been filed, the Department issued a new regulation broadening the definition of citizen of the United States in a manner that "mark[ed] a major shift in the number and kind of corporations that qualify as citizens under the Act."  *Id.* at *2, *4.  In essence, the court found that the amended definition of citizen of the United States was a substantive rule that could not be applied retroactively because it substantively changed the prior definition from 2013 in a manner that materially affected whether the statute would apply.  If the 2013 definition applied, Carnival would not have been a citizen of the United States and the statute would not have applied; however, if the 2016 definition applied "Carnival would be a citizen of the United States, Gummala would be a seaman, and a viable claim might lie against Carnival under the Act, meaning that Carnival's rights would be impaired, liabilities would be increased, and duties would be expanded."  *Id.*  For that reason, the court found that "retroactive application of the regulation would produce retroactive effects" that "would expose Carnival and other corporations to unexpected liabilities" and disrupt their settled expectations.  *Id.*  The City argues that the same logic applies here.

In contrast to the City, T-Mobile contends that applying the 2018 Declaratory Ruling to this matter would not have an impermissibly retroactive effect because the rule does not adversely affect any rights of the City or attach any new legal consequences to the City's denial of T-Mobile's application. In other words, T-Mobile argues that even if the FCC's Declaratory Ruling created a new

substantive rule, applying the rule in this case would not produce any impermissible retroactive effects.

Though T-Mobile concedes that three other district courts have already found that the rule should not be applied retroactively in similar contexts, T-Mobile argues that those decisions incorrectly found that retroactively applying the Declaratory Ruling would deprive the local governments in those cases of rights under the TCA. T-Mobile argues that the new rule does not impair any "rights" of local governments because the TCA actually *limits* local governments' authority to deny applications like T-Mobile's instead of granting them rights. And T-Mobile says the Declaratory Ruling did not create any new legal *consequences* of an improper denial of its application because the consequence is still an injunction ordering the City to grant the permit.

On this point, T-Mobile contends that the Ninth Circuit's decision in *Bahr v. Regan*, 6 F.4th 1059 (9th Cir. 2021) is persuasive. In *Bahr*, the Ninth Circuit addressed the State of Arizona's compliance with a requirement that states reduce their ozone concentration by July 2018 to comply with the Clean Air Act. *Id.* at 1063. Pursuant to its rulemaking authority, the EPA had previously promulgated a rule that would exclude exceedances of ozone concentration from consideration in its compliance determinations if the exceedances were caused by an extraordinary event such as a wildfire. *Id.* The EPA elected not to consider a 2015 wildfire in its determination that Arizona had attained compliance based on a 2016 version of the Extraordinary Events Rule, which had not been in effect at the time

of the wildfire in question.  *Id.*  As the court explained, the 2016 Exceptional Events
Rule modified an earlier version of the Exceptional Events Rule from 2007 in part
by "remov[ing] the need to show that the events were 'in excess of normal historical
fluctuations' and [the requirement] that 'but for the event' there would not have
been an exceedance."  *Id.* at 1067.  However, "[b]oth the 2007 and the 2016 rules
required demonstration of a clear causal relationship between the exceptional
event and the measured exceedances."  *Id.*  A group of citizens in Phoenix
challenged the EPA's retroactive application of the 2016 Exceptional Events Rule
to the wildfire in 2015.  *Id.* at 1064.  But the Ninth Circuit found that the EPA's
retroactive application of the 2016 Exceptional Events Rule "did not have an
impermissibly retroactive effect" because it "did not impact any vested rights,
create any new obligations, or otherwise impact any regulated party's interests in
fair notice, reasonable reliance, or settled expectations."  *Id.* at 1071–72.  T-Mobile
argues that the same logic applies in this case.

T-Mobile also places particular emphasis on the Ninth Circuit's
determination that "the local resident petitioners' interest in cleaner air was not
adversely affected 'by a refined implementation of statutory requirements or by a
matured scientific understanding.'"  (T-Mobile's 12/7/22 Suppl. Brief, Doc. 283 at
7) (quoting *Bahr*, 6 F.4th at 1073).  It argues, "Just as *Bahr* was concerned with the
ongoing evaluation of air quality, the instant case is concerned with the ongoing
evaluation of the City's continued denial of access to T-Mobile. And, as in *Bahr*,
the agency in the instant case 'provided fair notice as to the rule's change.'"  (*Id.*)

(quoting *Bahr*, 6 F.4th at 1073).  In T-Mobile's view, it would be improper for the Court to apply the significant gap test now that the FCC has rejected that test in favor of a new one representing a more refined interpretation of Section 332's anti-prohibition clause.

Having considered the parties' respective arguments, the Court finds that the Declaratory Ruling would have an impermissibly retroactive effect if it were to be applied retroactively because it would subject the City to a materially different standard that would have severe implications on its zoning authority.  That new standard, as conceived by the FCC's new regulations, would significantly alter both the City's local zoning authority and statutory authority under the TCA to consider a range of aesthetic and other concerns in connection with approval of telecommunications site placement, as well as the means and specific processes it uses to exercise such authority.  *See* 47 U.S.C. § 332(7)(A) ("Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities."); *Am. Tower*, 295 F.3d at 1207–08 ("Land use decisions are basically the business of state and local governments. . . . The legitimate power of federal courts to interfere in the kind of zoning decision involved in this case is limited."); (2016 MSJ Order at 38) ("[I]n order to establish a violation of the anti-prohibition clause, T-Mobile must . . . demonstrate: (1) that a 'significant gap' in its *own* service coverage exists; and (2) that the proposed tower is the 'least intrusive means' of

closing that gap (which requires having looked at 'alternative sites which would solve the problem')").

Though T-Mobile argues that the legal consequence of an impermissible denial would still be an injunction regardless of which legal test applies, there is still a question of whether the City would be statutorily liable in the first place depending on which legal test were to apply. Regardless of the potential forms of relief that T-Mobile may be entitled to, the legal consequences for the City would be different if the answer to that question would potentially be different depending on which legal test applies. In the absence of prior notice that this materially different standard would apply to its assessment of T-Mobile's application in 2017, application of the new rule to the City's prior decision would have an impermissibly retroactive effect.[13]

Admittedly, not all substantive rules will have an impermissibly retroactive effect if applied retroactively, as the Ninth Circuit recognizes in *Bahr*, but the situation in *Bahr* is not analogous. Importantly, the Plaintiff citizens in *Bahr* were not the regulated party in that case — the State of Arizona was. The petitioners were third-party citizens who "[were] not directly regulated by the Clean Air Act or the Exceptional Events Rule," and the State, which actually was directly regulated,

---

[13] T-Mobile points out that the Notice of Proposed Rulemaking for the 2018 Declaratory Ruling was issued before the City made its final decision to deny the application in 2017. However, even if the City had been aware of the Notice of Proposed Rulemaking, notifying the City of an uncertain potential change in the applicable legal standard at some point in the future would not necessarily put the City on notice that a different legal standard would apply to the decision that was currently before it at that point in time.

"d[id] not complain of any impermissible retroactivity affecting its vested rights, settled expectations, or reliance interests." *Bahr*, 6 F.4th at 1072–73. If anything, the new rule actually *helped* the State by allowing it to achieve compliance with its ozone reduction responsibilities.

In addition, part of the court's rationale in *Bahr* was that "an intervening implementation of a different articulation of a regulatory standard or balancing test does not automatically implicate retroactivity concerns—provided the new articulation does not dictate a 'certain' outcome." *Id.* at 1074 n.14. Based on the record before it, the court was not convinced that the EPA would have reached a different conclusion in its compliance determination if it had applied the 2007 version of the rule instead of the 2016 version. *See id.* ("Petitioners do not demonstrate that the 2016 version of the Exceptional Events Rule dictates an outcome different from that which the 2007 version would produce."). But unlike the intervening rule in *Bahr*, the 2018 Declaratory Ruing arguably "dictates an outcome different from that which the [alternative test] would produce." *Id.* at 1074 n.14. The fact that T-Mobile appears to view the Declaratory Ruling as outcome determinative such that the Court would not even need to complete its evidentiary hearing proves the point that applying the new rule to the City's prior decision would indeed have a retroactive effect.

In short, "[t]hese factors, considered in conjunction with the presumption against retroactive application of agency rulemaking and the lack of congressional authorization to apply this Declaratory Ruling retroactively, lead the Court to

conclude that the Declaratory Ruling should not apply retroactively to the claims in this case." *Eco-Site LLC*, 431 F. Supp. 3d at 1238–39 (footnote omitted). Accordingly, the Court finds that the Declaratory Ruling should not be applied retroactively in these circumstances.

### D.   Rule 1292(b) Certification

For the reasons above, the Court finds that the Declaratory Ruling should be treated as a substantive rule and should not be applied retroactively. Nevertheless, the Court acknowledges that this issue presents a very close call. In this particular situation, the Court finds that certification of the issues raised in this Opinion and Order are appropriate for immediate interlocutory appeal to the Eleventh Circuit, if either party seeks to pursue such an appeal.

Under 28 U.S.C. § 1292(b), appeal of a non-final order may be permitted when the district court certifies in writing that its order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Simpson v. Carolina Builders Corp.*, 222 F. App'x 924, 925 (11th Cir. 2007) (quoting 28 U.S.C. § 1292(b)). "Three factors are relevant in deciding whether an order merits interlocutory review under § 1292(b): (1) whether the case presents a 'controlling question of law'; (2) whether there is a 'substantial ground for difference of opinion'; and (3) whether the appeal will 'materially advance the ultimate termination of the litigation.'" *Id.* (citations omitted).

The first factor of this test is satisfied because the legal effect of the Declaratory Ruling and the related question of what legal test should apply to the City's denial of T-Mobile's application in 2017 present controlling questions of law. As far as this Court is concerned, the answers to these questions depend on whether the Declaratory Ruling should be treated as an interpretive rule or a substantive rule and whether the rule can be applied retroactively.  However, unlike this Court, the Court of Appeals could additionally consider whether the Declaratory Ruling represents an unreasonable interpretation of Section 332's anti-prohibition clause, as it would not be subject to *Chevron* deference, and that evaluation might obviate the need to determine whether the Declaratory Ruling provisions at issue here should be considered interpretive or substantive rules. These are precisely the type of "abstract legal issue[s]" that "the court of appeals 'can decide quickly and cleanly without having to study the record.'"  *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1258 (11th Cir. 2004) (quoting *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000)).

The second factor of this test for immediate interlocutory review is also satisfied here.  Even though the Court finds it appropriate to treat the Declaratory Ruling as a substantive rule that should not be applied retroactively, there is a reasonable basis for differences of opinion regarding whether the rule should instead be treated as an interpretive rule that does not implicate retroactivity concerns in the first place.  This is arguably so considering that the rule addresses interpretive questions about the construction of ambiguous statutory language.

49

Although courts that have addressed how Section 332's anti-prohibition clause should be read generally agree that some iteration of the significant gap test should apply to anti-prohibition claims under that provision, these courts are still in disagreement about precisely how the language should be read and precisely which tests should be utilized to assess those claims.  In the Eleventh Circuit, case law construing related provisions of Section 332 clearly establish that local government entities possess broad authority and are authorized to make zoning decisions related to the approval or denial of telecommunication facilities based on reasonable aesthetic considerations, property values, and other relevant concerns, including the availability of alternative sites. *Linet*, 408 F.3d at 761–62; *Am. Tower*, 295 F.3d at 1206–08.  Thus, to the extent the new regulations announced in connection with Section 332's anti-prohibition clause significantly constrain or repeal that authority, their retroactive application might be deemed inconsistent with governing Eleventh Circuit law in addition to the statutory directives imposed by Congress. *See City of Portland*, 969 F.3d at 1041 (finding that the 2018 Declaratory Ruling's limitations on local zoning authority were "broader than that contemplated by Congress" and "depart[ed] from the explicit directive of Congress in Section 332").  On the other hand, the Eleventh Circuit still has not interpreted the specific provision of Section 332 at issue in this case — the anti-prohibition clause.  So, at least in this Circuit, the 2018 Declaratory Ruling may still arguably provide "the primary and controlling rule in respect of the situation presented" and thus be "no more retroactive in its operation than is a judicial determination

construing and applying a statute to a case in hand." *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 135 (1936).

Relatedly, even though the 2018 Declaratory Ruling has substantive components that supplement the TCA by imposing additional conditions on localities, it also bears many of the hallmarks of an interpretive rule to the extent that it "clarif[ies] an unsettled or confusing area of the law" by "attempt[ing] to interpret the meaning of a statutory provision." *See Heimmermann*, 305 F.3d at 1260 ("A rule simply clarifying an unsettled or confusing area of the law . . . does not change the law, but restates what the law according to the agency is and has always been." (quoting *Pope*, 998 F.2d at 483)); *Fertilizer Inst. v. U.S. E.P.A.*, 935 F.2d 1303, 1309 (D.C. Cir. 1991) ("[T]he EPA's preamble passage represents the agency's attempt to interpret the meaning of a statutory provision. As such we have little difficulty in concluding that the rule is interpretative."); *see also Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1113 (D.C. Cir. 1993) (describing interpretive rules as "rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers"); *U.S. Techs. Corp. v. U.S. E.P.A.*, 821 F.2d 714, 719–20 (D.C. Cir. 1987) (stating that "[i]f the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency's interpretation of those provisions, it is an interpretative rule.").

This case is a perfect example of why other courts have observed "that it is quite difficult to distinguish between substantive and interpretative rules," *Syncor*

*Int'l Corp.*, 127 F.3d at 93, and why "the distinction between interpretative and legislative or substantive rules has been described by courts and commentators as 'fuzzy,' 'tenuous,' 'blurred,' 'baffling,' and 'enshrouded in considerable smog,'" 126 A.L.R. Fed. 347 (footnotes omitted).  As the D.C. Circuit has recognized, the distinction between interpretive rules and substantive rules depends on whether the agency is "construing" a statute by explaining its understanding of what a statute requires or "supplementing" it in a manner that goes beyond the text of a statute. *Am. Mining Congress*, 995 F.2d at 1110.  However, as is especially true in this case, "[t]he difficulty with the distinction is that almost every rule may seem to do both," *id., though this Court ultimately concludes that the FCC has supplemented its regulations in a manner that goes beyond the text of the underlying statute.*

Further complicating matters, although the Eleventh Circuit has not squarely addressed the issue, case law from out of Circuit suggests that specific components of a rule can still be interpretive even if other components of the rule are functionally substantive.  *See, e.g.*, *Fertilizer Inst.*, 935 F.2d (finding that component of EPA rule construing the term "release" as applied to CERCLA's reporting requirements was interpretive when the rule also contained provisions setting reportable quantities and exemptions to reporting requirements); *U.S. Techs. Corp.*, 821 F.2d (finding that "most, if not all" of EPA final rule was "'interpretative' in nature" when the rule both articulated the EPA's view of Congress's statutory intent and included additional substantive regulations).  A

finding that the first part of the Declaratory Ruling is interpretive may be dispositive here because it establishes the standard for resolving effective prohibition claims, which, admittedly, is the only issue currently before the Court. (*See* T-Mobile's 10/15/21 Brief at 10) (stating that "the sole issue raised currently in this case" is "the FCC's discussion of the appropriate standard for evaluating whether a local government's denial of a wireless facilities application has the effect of prohibiting the provision of personal wireless service").  On the other hand, even if the 2018 Declaratory Ruling should be treated as an interpretive rule instead of a substantive rule, it may very well reflect an unreasonable interpretation of Section 332's anti-prohibition clause, meaning that it should not be applied in this matter anyway.

For all of these reasons, the Court finds that there is a substantial ground for difference of opinion as to whether the 2018 Declaratory Ruling should be treated as an interpretive rule or a substantive rule and whether the Court should apply the standard articulated in the 2016 MSJ Order to the City's decision instead of applying the materially inhibits standard.

Finally, the third factor is satisfied because a resolution of these issues on appeal may materially advance the progress and termination of this litigation.  If it turns out that the materially inhibits standard articulated in the Declaratory Ruling should apply after all, it would be preferable for the Eleventh Circuit to resolve that issue now instead of after the completion of the previously interrupted 2018 evidentiary hearing, or, alternatively, a remand of the case to the City Council for

review, either of which could potentially be applying the incorrect legal standard. Also, if T-Mobile is correct that it should be entitled to judgment on the merits without the need for a hearing if the materially inhibits standard applies in this matter, it could obviate the need for an evidentiary hearing altogether.  At the same time, if the Eleventh Circuit determines that the Declaratory Ruling reflects an unreasonable interpretation of the TCA that should not be entitled to deference under *Chevron* — an issue that falls outside of this Court's purview — a decision to that effect could materially advance the litigation as well.  In situations like this one, Section 1292(b) authorizes the Court to call its appellate lifeline.  Based on these considerations, the Court finds that certification for interlocutory appeal of this Opinion and Order is appropriate.  Accordingly, this issue is certified to the Eleventh Circuit for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  The Court after this litigation journey is confident either or both parties will timely pursue that option.

## IV.   Conclusion

For the foregoing reasons, the Court finds that the 2018 Declaratory Ruling is a substantive rule that should not be applied retroactively to the City's decision to deny T-Mobile's application in 2017.  The Court will therefore apply the standard articulated in the 2016 MSJ Order as well as governing Eleventh Circuit law when resolving the parties' pending Motions for Summary Judgment.  However, either party may file an interlocutory appeal of this Opinion and Order if they so choose. The Court will defer ruling on the parties' Motions for Summary Judgment [Docs.

186, 209] or setting a date for resuming the previously continued evidentiary hearing until the parties have determined whether to pursue an appeal.

If any party decides to pursue an interlocutory appeal, **Section 1292(b) requires that they file their application with the Eleventh Circuit within TEN days of the entry of this Opinion and Order**.  The Court therefore **DIRECTS** any party who files an application for interlocutory appeal with the Eleventh Circuit to **FILE A NOTICE** on the docket to notify this Court of their pursuit of the appeal **WITHIN THREE DAYS OF FILING THE APPLICATION IN THE COURT OF APPEALS**.  Alternatively, if all parties determine after consideration of the Opinion and Order that they wish to continue with the next stages of proceedings in this Court, the Court will resume its previously continued evidentiary hearing applying the legal standard articulated in the 2016 MSJ Order.

**IT IS SO ORDERED** this 17th day of March, 2023.

AMY TOTENBERG
**UNITED STATES DISTRICT JUDGE**